UNITED STATES *v.* HERCULES ANTIQUES, THE DANWILL COMPANY
(No. 4888) [1]

United States Court of Customs and Patent Appeals, June 25, 1957

*George Cochran Doub*, Assistant Attorney General and *Richard E. FitzGibbon*, Chief, Customs Section for the United States.

*Barnes, Richardson & Colburn* (*Joseph Schwartz* and *Edward N. Glad* of counsel) for appellees.

[Oral argument February 12, 1957, by Mr. FitzGibbon and Mr. Glad]

Before JOHNSON, Chief Judge, and O'CONNELL, WORLEY, RICH, and JACKSON (retired), Associate Judges

[1] C. A. D. 662.

WORLEY, Judge, delivered the opinion of the court:

This is an appeal from the judgment of the United States Customs Court, First Division, Abstract 59910, sustaining the protest of appellees, and overruling the collector's classification of the involved merchandise as an indirect importation from Czechoslovakia. The collector refused to give the importers the benefit of the trade agreement applicable to importations from Holland, but inapplicable to nations under Communist domination.

The pertinent parts of the statues and the Presidential proclamations are:

Paragraph 218 (f), Tariff Act of 1930:

(f) Table and kitchen articles and utensils, and all articles of every description not specially provided for, composed wholly or in chief value of glass, blown or partly blown in the mold or otherwise, or colored, cut, engraved, etched, frosted, gilded, ground (except such grinding as is necessary for fitting stoppers or for purposes other than ornamentation), painted, printed in any manner, sandblasted, silvered, stained, or decorated or ornamented in any manner, whether filled or unfilled, or whether their contents be dutiable or free, 60 per centum ad valorem.

Paragraph 218 (f), as modified by T. D. 51898:

| Tariff Act of 1930, paragraph | Description of Products | Rate of Duty |
|---|---|---|
| 218 (f)__ | Table and kitchen articles and utensils, and all articles of every description not specially provided for, composed wholly or in chief value of glass, blown or partly blown in the mold or otherwise, or colored, cut, engraved, etched, frosted, gilded, ground (except such grinding as is necessary for fitting stoppers or for purposes other than ornamentation), painted, printed in any manner, sandblasted, silvered, stained, or decorated or ornamented in any manner, whether filled or unfilled, or whether their contents be dutiable or free (except articles primarily designed for ornamental purposes, decorated chiefly by engraving and valued at not less than $8 each). <br> * * * Other_____ | 50¢ on each article or utensil, but not less than 30% nor more than 50% ad val. |

### Presidential proclamation, T. D. 52788:

WHEREAS sections 5 and 11 of the Trade Agreements Extension Act of 1951 (Public Law 50, 82nd Congress) provide as follows:

˙ SEC. 5. As soon as practicable, the President shall take such action as is necessary to suspend, withdraw or prevent the application of any reduction in any rate of duty, or binding of any existing customs or excise treatment, or other concession contained in any trade agreement entered into under authority of section 350 of the Tariff Act of 1930, as amended and extended, to imports from the Union of Soviet Socialist Republics and to imports from any nation or area dominated or controlled by the foreign government or foreign organization controlling the world Communist movement.

SEC. 11. The President shall, as soon as practicable, take such measures as may be necessary to prevent the importation of ermine, fox, kolinsky, marten, mink, muskrat, and weasel furs and skins, dressed or undressed, which are the product of the Union of Soviet Socialist Republics or of Communist China.

*     *     *     *     *     *     *

Now, THEREFORE, I, HARRY S. TRUMAN, President of the United States of America, * * * do proclaim:

PART 1

That the application of reduced rates of duty * * * established pursuant to trade agreements * * * shall be suspended with respect to imports from such nations and areas referred to in section 5 as may be specified in any notification pursuant to this part of this proclamation given by the President to the Secretary of the Treasury, * * * *For the purposes of this part the term "imports from such nations and areas" shall mean articles imported directly or indirectly into the United States from nations or areas specified in an effective notification,* but shall not in any case include articles the growth, produce, or manufacture of any other nation or area. [Italics ours.]

### Presidential letter, T. D. 52837:

My Dear Mr. Secretary:

Pursuant to Part 1 of my proclamation of August 1, 1951, carrying out sections 5 and 11 of the Trade Agreements Extension Act of 1951, *I hereby notify you that the suspension provided for therein shall be applicable with respect to imports from Czechoslovakia* which are entered, or withdrawn from warehouse, for consumption after the close of business on November 1, 1951. [Italics ours.]

Very sincerely yours,<br>HARRY S. TRUMAN.

Both parties agree that the merchandise, consisting of second hand or antique glass articles such as decanters, covered compotes, and covered dishes, was purchased in Holland by the importers' representative and shipped to the United States from that country. The goods were not manufactured in Holland but appear to have originated in Bohemia, which is now a part of Czechoslovakia. It is also conceded that Czechoslovakia is a so-called Iron Curtain country dominated by Soviet Russia.

The issue is whether the merchandise has been imported directly from Holland, as claimed by the importers, or indirectly from Czechoslovakia, as claimed by the Government.

We are not aware of any previous judicial interpretation of the Presidential proclamation. It is evident, however, both from the language of the proclamation itself and from the legislative history of the statute on which it is based, that it was the intention of Congress

and the President to withhold from Communist-dominated countries the benefits of rates of duty reduced by trade agreements. At the very least, the language used was intended as a red light to indicate to the appropriate officials that merchandise originating in Communist-dominated countries should be examined with great care before it could be accepted as an import from any other country.

Appellees point out that whereas section 11 of the Trade Agreements Extension Act of 1951 specifically prohibits importation of furs of certain kinds "which are the product of the Union of Soviet Socialist Republics or of Communist China," section 5 of that Act relates only to "imports" from the nations specified in that section. From that difference in language, appellees reason that section 5 was intended to be more limited than section 11, and was not designed to apply to all articles produced in Communist-dominated countries. We agree with that reasoning, and are of the opinion that section 5 definitely contemplates that articles may, under proper circumstances be imported into the United States at rates of duty reduced by trade agreements, notwithstanding the fact that they were originally produced in Communist-dominated countries.

On the other hand, in view of the evident objective of the Presidential proclamation, and its broad reference to "articles imported directly or indirectly" from Communist-dominated nations, it seems clear that the proclamation looks to the substance rather than the manner of importation, and that its purpose is to deny reduced rates of duty to all imports which are so closely related to a Communist-dominated nation that such nation may derive benefit from the reduction in duty.

There also appears to have been no prior decision as to the meaning of the expression "imported indirectly," but in *United States* v. *United Cigar Stores Co.*, 1 Ct. Cust. Appls. 450, T. D. 31505, decided long prior to the instant proclamation, it was held that merchandise originally destined for the United States remained a *direct* importation from the country in which it originated, even though it was transshipped in an intermediate country, if it had not become a part of the commerce of that country. It is reasonable to assume, therefore, that the words "imported indirectly" in the proclamation were intended to include merchandise which had been separated from the country in which it originated by something more than mere passage through or transshipment in an intermediate country.

It would be difficult, if not impossible, to define exact standards for determining the duration of stay of merchandise in an intermediate country, the nature of the transactions to which it is subjected there, and other circumstances necessary to divest it of its status as an import, direct or indirect, from the Communist-dominated country in which it originated. However, we are of the opinion it must be established by appropriate evidence that the merchandise has actually

become a *bona fide* part of the commerce of the intermediate country. That responsibility which, of course, rests upon the importer has not been satisfactorily discharged here.

If the goods of such countries could be imported into the United States at reduced rates of duty merely because (instead of being brought in directly) they were purchased from dealers in other countries, it seems clear that such dealers could well make a practice of buying goods of that type with a view to reselling them to American importers. It is equally clear that such a practice would increase the commerce of the Communist-dominated country in which the goods were produced and would thus inure to the benefit of that country. Whether the sale in the intermediate country was made privately or in the open market, by auction or otherwise, is not, of and by itself, controlling. The ultimate effect of such sales, however made, would be to permit the goods of Communist-dominated countries to reach the American market at a reduced rate of duty, and thus to compete on more favorable terms with the goods of countries which are not so dominated.

In our opinion a holding that the fact that the goods of a Communist-dominated country were merely purchased in another country was sufficient to permit them to be imported into the United States at reduced rates of duty would defeat the clear purpose of the Presidential proclamation, since it would permit the Communist-dominated countries to obtain the benefit of the reduced rates merely by dealing through agents in other countries. Even assuming that, for some purposes, goods which are made in one country and sold in the open market of another before they are imported into the United States are to be considered an import from the latter country, we do not think that such a view can be taken in the instant situation. We are dealing here with a specific proclamation designed to accomplish a definite purpose. Under such circumstances it is clearly our duty to supply the interpretation which will best give effect to the intent of the proclamation.

For the reasons given we conclude that the mere fact that the instant merchandise was sold in Holland is not alone sufficient to establish that it was not imported "directly or indirectly" from Czechoslovakia. It remains to be determined whether any other facts have been proved which would change the status of the merchandise to an import from Holland rather than Czechoslovakia.

The evidence comprises the invoices and related papers for the merchandise admitted over the Government's objection on the ground of hearsay, together with the testimony of a single witness, one Louis Briller, a partner in the firm of Hercules Antiques, one of the importing firms.

While uncontradicted statements in invoices have been held to have some evidentiary value, *United States* v. *Bloomingdale Bros.*

*& Co.*, 10 Ct. Cust. Appls. 149, T. D. 38400, it is well settled that the statements contained in invoices or accompanying papers are not, alone, sufficient to overcome the presumption of correctness attendant upon the findings of the collector. *United States* v. *National Aniline and Chemical Co.*, 3 Ct. Cust. Appls. 10, T. D. 32287; *United States* v. *Ocean Brokerage Co.*, 11 Ct. Cust. Appls. 38, T. D. 38648; and *Hull* v. *United States*, 10 Ct. Cust. Appls. 211, T. D. 38556. In the *Hull* case it was also held that such papers supplemented by hearsay evidence were not sufficient to overcome the presumption.

It may be noted, moreover, that the invoices and accompanying papers in the instant case, even if taken at full face value, show no more than that the merchandise was purchased from dealers in Holland and that some of the purchases were made at auctions.

The witness had no first-hand knowledge as to where the merchandise came from, and was not in Holland when it was purchased. He testified that his knowledge of the purchases was derived from "what was put on the invoice and from bills that were given at the same time." Testimony based on such information is obviously hearsay and adds little evidentiary value to the invoices themselves. It seems clear that since the invoices are not sufficient to show that the collector's ruling is incorrect, the testimony of a witness who knows little or nothing about this particular importation except what he has learned from invoices, is equally insufficient.

The witness attempted to compensate for his lack of specific knowledge of material facts by generalizations. For example, he testified with respect to the imported articles as follows:

They were mainly decanters and covered compotes, covered canning dishes of a particular design, which are not made any more today. This particular merchandise that I have known all my life was made especially for the Holland-Dutch market.

\*　　\*　　\*　　\*　　\*　　\*　　\*

In the trade we call this Dutch crystal, because of the mere fact that so much of it is and was found in Holland that some people even thought it had been manufactured in Holland. To my knowledge, which is fairly thorough, this merchandise has not been manufactured in Holland.

He further testified that he recognized the names of some of the dealers from whom, according to the invoice the articles were purchased, as antique dealers and auctioneers.

That testimony seems designed to, and probably might, convey the impression that the particular merchandise had been in Holland for a long time before it was purchased. In addition, it is noted that appellees' attorney also stated that it would be "brought out" that the merchandise went into Holland prior to World War I. However, no actual evidence to support either statement was introduced.

Again, there is no evidence whatever as to the history of the specific articles before they were purchased from dealers in Holland. There is nothing to show when, where, how, why, or from whom they were purchased by the dealers, nor when they entered Holland. So far as appears from the record they might have been exported to Holland from Czechoslovakia for the purpose of immediate re-sale on the very day they were purchased by the importers' representative. On this record we cannot properly conclude from the fact that they were sold in Holland by antique dealers that they had entered Holland long before their sale. There is no apparent reason why antiques from Czechoslovakia cannot be bought directly from there and resold by dealers in Holland. Similarly, the dealers in Holland from whom the merchandise was purchased might well have been acting as agents for persons in Czechoslovakia.

In the instant case there is a presumption that the merchandise is an import from Czechoslovakia, not only because the collector has so held, but also because it is conceded that the merchandise originated there. Such a presumption can be overcome only by clear evidence that something had happened to the merchandise before it was imported into the United States to convert it to an import from Holland. We are not at liberty to assume that because a considerable amount of glassware similar to that here has been in Holland for a long time, the same is also true of the particular articles under consideration. It was the importers' burden to show by proper evidence, rather than by speculation and assumption, that the connection between those articles and Czechoslovakia had been so effectively broken that they could no longer be regarded as imports from that country.

The case of *D & B Import Corp.* v. *United States*, 29 C. C. P. A. (Customs) 65, C. A. D. 172, relied on by the appellees and the Customs Court, is not controlling here, since it related only to the applicability of the Cuban Reciprocity Treaty and the Cuban Trade Agreement to merchandise originating in Cuba, sold in Bermuda, and exported from there to the United States. No question of direct or indirect importation was at issue, and certainly the statutory authority present here was not involved. Moreover, the court emphasized that the purpose of the treaty was to grant rights *to the Republic of Cuba*, and that to grant a low rate of duty to goods which had been exported from Cuba and sold in another country for export to the United States would confer no benefits on Cuba and thus would not serve the purpose of the treaty.

Appellees also rely on the decisions in *Maier, Morton & Browne* v. *United States*, 11 Ct. Cust. Appls. 115, T. D. 38753; *H. J. Heinz Co.* v. *United States*, 43 C. C. P. A. (Customs) 128, C. A. D. 619; and *Kobe Import Co.* v. *United States*, 43 C. C. P. A. (Customs) 136,

C. A. D. 620, in each of which merchandise which had been sold in an intermediate country was held to have lost its status as an importation from the country in which it originated. Each of those cases, of course, was decided on its particular facts, and, moreover, they did not involve the proclamation here under consideration. Accordingly, we do not find them controlling.

The Customs Court also relied on its former decision in *Camera Specialty Co., Inc. and Rohner Gehrig & Co.* v. *United States*, 34 Cust. Ct. 27, C. D. 1672, which involved certain lenses and lens parts, originally manufactured in the Russian-occupied zone of Germany, which were imported directly from there into the United States and cleared through United States customs. Thereafter they were exported to the Western Zone of Germany for repairs and when returned to the United States they were held to be imports from such Western Zone. That case is clearly distinguishable from the instant one, not only in that the goods had been altered in the Western Zone of Germany, whereas here there is no evidence the merchandise was altered in Holland, but also in that the goods there had already paid, on their initial entry into the United States, the higher rate of duty required on importations from Communist-dominated countries.

The judgment appealed from is *reversed*.

JACKSON, J., Retired, recalled to participate herein in place of COLE, J., absent because of illness.

---

JOHNSON, Chief Judge, dissenting:

I agree with the unanimous decision of the Customs Court that the importer has overcome the presumption of correctness attaching to the collector's classification, and that "at the time the glassware in question was exported from Holland, it had become part of the commerce of that country and had lost any connection that it had formerly had with Bohemia or Czechoslovakia, or any other nation in which it had been manufactured."

Mr. Louis Briller was the only witness and his uncontradicted testimony is that the involved merchandise was produced in Bohemia long before that country became a part of Czechoslovakia; that in the trade it was known as Dutch crystal "because of the mere fact that so much of it is and was found in Holland that some people even thought it had been manufactured in Holland"; that he has been an antique dealer for about 25 years, throughout which time he has been a partner in appellant Hercules Antiques; that the business of Hercules Antiques is buying and selling antiques, both to the trade and to the general public; that Hercules Antiques was formed in Amsterdam, Holland, in 1930, where it remained until 1939 when it was moved to the United States; that since coming to the United

States he has gone to Holland once or twice a year; that on each trip to Holland he purchased merchandise in Holland which is similar to that here involved and that the involved purchase and importation was made in the regular course of business; that the merchandise at bar was purchased "In Holland, in auction rooms or from antique dealers or second-hand dealers" whom he knew to be antique dealers, and owners of auction rooms and second-hand stores, and that he was familiar with the market in Holland in which the merchandise was purchased at the time of this importation.

The cases cited by the Customs Court, *Camera Specialty Co., Inc., and Rohner Gehrig & Co., Inc.* v. *United States,* 34 Cust. Ct. 27, C. D. 1672, and *D. & B. Import Corp.* v. *United States,* 29 C. C. P. A. (Customs) 65, C. A. D. 172, are in point here and support this dissent. Also in point are *Maier, Morton & Browne* v. *United States,* 11 Ct. Cust. Appls. 115, T. D. 38753; *H. J. Heinz Co.* v. *United States,* 43 C. C. P. A. (Customs) 128, C. A. D. 619; and *Kobe Import Co.* v. *United States,* 43 C. C. P. A. (Customs) 136, C. A. D. 620. The majority passes these cases over by simply saying that each of them was decided on its particular facts.

Not a single statement found in either the invoices or related papers which were introduced in evidence was contradicted. Regarding these invoices and related papers, the majority states:

While uncontradicted statements in invoices have been held to have some evidentiary value, *United States* v. *Bloomingdale Bros. & Co.,* 10 Ct. Cust. Appls. 149, T. D. 38400, it is well settled that the statements contained in invoices or accompanying papers are not, alone, sufficient to overcome the presumption of correctness attendant upon the findings of the collector. *United States* v. *National Aniline and Chemical Co.,* 3 Ct. Cust. Appls. 10, T. D. 32287; *United States* v. *Ocean Brokerage Co.,* 11 Ct. Cust. Appls. 38, T. D. 38648; and *Hull* v. *United States,* 10 Ct. Cust. Appls. 211, T. D. 38556.

A careful reading of the cases above cited leads to the inescapable conclusion that the majority has misapplied them. The *Bloomingdale* case stands for much more than the proposition that statements in invoices have "*some* evidentiary value." [Emphasis added.] In that case the court stated:

True, the statements of the invoice do not finally conclude the collector, but to say that such a document, hedged about as it is by sanctions and safeguards to secure correctness, has no evidentiary value whatever in the absence of better evidence as to the tariff status and dutiable value of merchandise, is to say that Congress did a useless thing and required a document to supply information to the collector for official purposes which was not even weak prima facie evidence of that which is stated. *Not only is the invoice prima facie evidence of that which it declares* (emphasis added), but unimpeached and not mistrusted or discredited, it is *the* evidence which determines the collector's action as to all imported merchandise which has not been examined. * * *

\*        \*        \*        \*        \*        \*        \*

* * * If the law contemplates that the collector may assess and collect duties on the declaration of an unimpeached invoice in the absence of better evidence,

there is no reason apparent why the board and the courts should not accord to such an invoice, which by the way forms part of the record, like credit under similar circumstances, and that is what the board and the courts have done.

The opinion in that case indicates that the statements in the invoice constituted the only evidence in the record, which evidence the court relied upon to affirm the judgment below, sustaining the protest.

The *National Aniline and Chemical Co.*, *Ocean Brokerage Co.* and *Hull* cases, while lending limited support to the proposition attributed by the majority to them, are inapposite to the instant case. Neither the *Hull* nor *National Aniline and Chemical Co.* cases involved invoices.

Thus, we should accept as true, consistent with the *Bloomingdale* case, the facts that the merchandise was purchased from the dealers named therein in Holland, that it was purchased from antique dealers, in auction rooms and second-hand stores in the regular course of business and that the merchandise had become a part of the commerce of Holland at the time it was purchased.

The testimony, invoices and related papers, while not constituting the most perfect evidence on which to base a decision, are sufficient to establish a prima facie case on behalf of appellees. This is all the law requires. *United States* v. *Edson Keith & Co.*, 5 Ct. Cust. Appls. 82, T. D. 34128. It is well established that the collector's classification has no evidentiary value, *United States* v. *Marshall Field & Co.*, 18 C. C. P. A. (Customs) 469, T. D. 44761. Since appellees' have established a prima facie case and the Government has not presented any evidence to overcome appellee's prima facie case, I think the judgment of the Customs Court should be affirmed.