The UNITED STATES, Appellant,

v.

EXXON CORPORATION, Chevron
Oil Co., Appellees.

Appeal No. 79–9.

United States Court of Customs
and Patent Appeals.

Sept. 13, 1979.

Barbara Allen Babcock, Asst. Atty. Gen., Washington, D. C., David M. Cohen, Branch Director, Joseph I. Liebman, Sidney N. Weiss, New York City, for the U. S.

Joseph F. Donohue, Jr., Donohue & Donohue, New York City, attorney of record, for appellees.

\* The Honorable Robert L. Kunzig, United States Court of Claims, sitting by designation.

\*\* The Honorable John G. Penn, United States District Court for the District of Columbia, sitting by designation.

1. 475.35 Naphthas derived from petroleum, shale oil, natural gas, or combinations thereof (except motor fuel) . . . . . . . . . 0.25¢ per gal.

2. 475.25 Motor fuel . . . . . . . . . . . . . 1.25¢ per gal.

3. T.D. 66–23(13) *Motor fuel. Standards for classification of naphtha-type and kerosene-type materials as motor fuel.*—The following table captioned "CRITICAL PROPERTIES OF MATERIALS CHIEFLY USED AS MOTOR FUELS IN INTERNAL COMBUSTION OR OTHER ENGINES IN THE UNITED STATES" is published for the guidance of customs officers in identifying petroleum materials which are chiefly used as motor fuels as defined in *Schedule 4, Part 10, Headnote 2(b)*, and classifiable under the provision for Motor fuel, in *item 475.25*, TSUS. Classification of an imported petroleum product as a Motor fuel under *item 475.25*, TSUS, would be indicated if for each of the properties listed in the table for a given type of motor fuel, the corresponding

Before MARKEY, Chief Judge, and BALDWIN, MILLER, KUNZIG \* and PENN,\*\* Judges.

PENN, Judge.

This appeal is from the judgment of the United States Customs Court, 81 Cust.Ct. 87, C.D. 4772, 462 F.Supp. 378 (1978), which sustained the importer-appellees' claim that the imported product, a petroleum derivative, should have been classified as naphtha under item 475.35 [1] of the Tariff Schedules of the United States (TSUS) rather than as motor fuel under TSUS item 475.25.[2] We affirm.

## Background

Treasury Decision 66–23(13) (1966) [3] describes the critical properties of materials chiefly used as motor fuel in internal combustion or other engines in the United States at the time of the importation in question. For aviation gasoline, one of the properties of the imported product fall within the ranges set out in the table for that type of motor fuel. The standards for motor fuels contained herein supersede any standards previously published by the Bureau for petroleum materials chiefly used as motor fuels. These standards in the table will be reviewed periodically and revised, when appropriate, to reflect any change in chief use of such materials.

CRITICAL PROPERTIES OF MATERIALS CHIEFLY USED AS MOTOR FUELS IN INTERNAL COMBUSTION OR OTHER ENGINES IN THE UNITED STATES

(For Use in Classifying Imported Naphtha-Type or Kerosene-Type Materials)

|  | Automotive Gasoline all grades | Gasoline all grades | Aviation Turbine Fuels Military JP–4 Commercial JET B | Military JP– Commercial JET A & AI |
|---|---|---|---|---|
|  | ---------- Minimum to Maximum Range Limits ---------- | | | |
| Gravity, °API, ASTM D–237 | 56 3–67 7 | 64.0–76.2 | 49 1–56 5 | 36.5–46.0 |
| Distillation, ASTM D-86 | | | | |
| °F at 10% D + L | 103–135 | 138–165 | 180–246 | 352–394 |
| °F at 50% | 185–233 | 174–220 | 232–360 | 392–432 |
| °F at 90% | 301–358 | 213–260 | 331–468 | 424–495 |
| Reid Vapor Pressure, psi ASTM D–323 | 7 5–13 2 | 5 8–7.0 | 2 0–2 9 | 0.0–0.5 |
| Octane (Research) ASTM DO90S | 83 1–103 3 | 81–105 | – | – |
| Octane (Motor) ASTM D–357 | 79 5–99.6 | 81–105 | – | – |
| Freeze Point, °F, ASTM D–1477 | – | – | (—110)–(—76) | (—69)-(—48) |
| Olefins, Volume %, ASTM D–1319 | – | – | 0–2 9 | 0.0–4.5 |
| Appearance | -------------------- Clear and Bright -------------------- | | | |

Bureau letter dated January 19, 1966. (418.114)

four categories of motor fuel in T.D. 66–23(13), seven characteristics are listed. Upon importation, the Customs Service tested a sample of the imported merchandise for four of these properties. Finding the imported product to fall within the T.D. 66–23(13) range for aviation gasoline for these four items, Customs classified the imported product as motor fuel under TSUS 475.25.

The importer challenged this classification claiming that the imported product fell outside of the T.D. 66–23(13) guidelines, and therefore could not be used as motor fuel and should have been classified as naphtha under TSUS 475.35. At trial the importer introduced test data obtained from samples taken in the ordinary course of doing business: (1) just before the tanker left Aruba, and (2) after the merchandise had been unloaded into a storage tank in New Jersey. All these tests indicated that the product fell outside the ranges reported in T.D. 66–23(13). The importer theorized that the sample taken by Customs must have been contaminated. With regard to the 10% distillation temperature reported in the importer's tests, the importer offered uncontroverted testimony that it would be difficult if not impossible to start a motor with a substance with such a high 10% distillation temperature.

### Customs Court Decision

The Customs Court held that the presumption of correctness which attached to the Customs Service classification was rebutted. The court based this decision on the failure of the Government to test for each of the properties listed in T.D. 66–23(13). In support of this holding, the court noted that the Government's own witness, the Government chemist who performed the testing for Customs, admitted that by themselves the four properties tested for were insufficient to support a determination that the imported product was motor fuel.

Weighing the various test data before it, the Customs Court found that the preponderance of evidence supported the conclusion that the imported merchandise fell outside of the T.D. 66–23(13) standards for motor fuel. Since the imported product was only a blending agent used in motor fuel, the court held that it was not itself motor fuel. Accordingly, the Customs Court sustained the importer's claim that the imported merchandise should have been properly classified as naphtha under TSUS 475.35.[4]

### Issues Raised on Appeal

Essentially the Government makes two arguments on appeal. First it maintains that TSUS Schedule 4, Part 10, headnote 2(b)[5] should be interpreted as covering within the definition of motor fuel a product which when combined with additives is chiefly used as motor fuel. Since the importer did not introduce evidence that the imported merchandise with additives was not chiefly used as motor fuel, the Government contends that the importer did not rebut the presumption of correctness which attached to the Customs classification of the merchandise as motor fuel.

The Government also argues that the Customs Court erred in holding that all the requirements of T.D. 66–23(13) had to be met in order for a petroleum product to be classified as motor fuel. In this regard the Government maintains that T.D. 66–23(13) was merely published for guidance and can neither expand nor constrict the scope of the statutory definition of motor fuel found in TSUS Schedule 4, Part 10, headnote 2(b).

### OPINION

#### I

In *California Oil Co. v. United States*, 29 Cust.Ct. 44, C.D. 1442 (1952), the Customs Court held, *inter alia*, that a blending component, used *in* gasoline motor fuel but not suitable for use *as* motor fuel, was not

---

4. There was never any dispute over the fact that the imported merchandise is described by the generic term naphtha.

5. See *infra*.

chiefly used as motor fuel. Since then Congress has added a definition of the term motor fuel in TSUS Schedule 4, Part 10, headnote 2(b):

"Motor fuel" (item 475.25) is any product derived primarily from petroleum, shale, or natural gas, whether or not containing additives, which is chiefly used as a fuel in internal-combustion or other engines.

The Government contends that this definitional section was intended to overrule the *California Oil* decision. We disagree.

■ Headnote 2(b) provides that to be motor fuel a product must be ". . . chiefly used *as* a fuel . . ." (emphasis added). This wording is consistent with the *California Oil* ruling. Had Congress intended to change the law, and broaden the meaning of the term motor fuel to include substances which are not suitable for use *as* motor fuel, but are used *in* motor fuel, they could have used the wording, chiefly used *in* a motor fuel, instead.

■ The inclusion of the phrase ". . . with or without additives . ." in headnote 2(b) does not support the Government's interpretation of headnote 2(b), i. e., that motor fuel is a product which when combined with additives is chiefly used as motor fuel. The plain meaning of the phrase "with or without additives" in headnote 2(b) is that the presence or absence of additives will not alter the classification of a product which would otherwise be classified as motor fuel.

The Government has failed to bring to our attention anything in the legislative history of the TSUS that would indicate Congress meant to overrule *California Oil* by adding the headnote 2(b) definition of motor fuel. The explanatory notes to the Tariff Classification Study merely state: "Also, the term 'motor fuel' has been defined." *Tariff Classification Study*, Schedule 4, p. 167 (1960).

■ The only particular portion of TSUS legislative history relied on by the Government is a letter written by attorneys for Imperial Oil and published in *Tariff Classification Study*, Schedule 4, pp. 355–59 (1960). This letter does not support the Government's position that the alternative classification, pressed by the importer and adopted by the Customs Court, TSUS 475.-35, naphthas derived from petroleum, shale, oil, natural gas, or combinations thereof (except motor fuel), does not include naphthas used *in* motor fuel. Not a single reference to motor fuel, its definition, or the *California Oil* decision, is found in this letter. The letter is primarily concerned with a completely different subject, the tariff treatment of hydrocarbons formerly made from coal tars but now primarily made by petroleum which are used as raw materials in the petrochemical industry. The only reference to naphthas in the letter is a proposal, *supra* p. 356, that naphthas having narrow boiling ranges which are commercially useful as solvents be taken out of TSUS item 475.35 and classified by predominant hydrocarbon component.[6] If anything this paragraph would seem to indicate that the term naphtha as used in TSUS 475.35 is a very broad term covering many things, the import of the paragraph being that it covers too much.

■ To sum up, we agree with the Customs Court that there is a distinction in the tariff law between petroleum products used *in* motor fuel and petroleum products used *as* motor fuel, and only the latter are properly classifiable motor fuel under TSUS 475.25 as defined in TSUS Schedule 4, Part 10, headnote 2(b). Since the imported product is unsuitable for use as motor fuel (its 10% distillation temperature is so high that it would be difficult if not impossible to start a motor with it), the Customs Court was correct in not classifying it as such.

---

6. "We believe that petroleum naphthas having narrow boiling ranges and commercially used as solvents, which are commonly designated according to the predominent [sic] hydrocarbon component, such as heptane, hexane, and pentane, are covered by item 475.35 in your draft of Schedule 4, but that they would be more specifically provided for by our suggested items 475.36, 475.38, and 475.40."

## II

The Government also challenges the Customs Court's holding that all the requirements of T.D. 66–23(13) had to be met for a petroleum product to be classified as motor fuel. The Government is, of course, correct that the statutory definition of motor fuel contained in TSUS Schedule 4, Part 10, headnote 2(b) determines what is or is not a motor fuel. However, this does not negate the significance of T.D. 66–23(13). The definition of motor fuel in headnote 2(b) requires that the product be "chiefly used as a fuel in internal combustion or other engines." The listing of critical properties of motor fuels in T.D. 66–23(13) constitutes evidence of what characteristics a petroleum derivative must possess to be suitable for use as a motor fuel, and is therefore a tool in determining whether or not the requirement of headnote 2(b), that the product be chiefly used as motor fuel, is met.

Properties listed in T.D. 66–23(13) are not irrefutable. The Government and the importer are at liberty to establish that a standard listed as critical is really unimportant.[7] However, in the case at bar no such showing was made. To the contrary, the Government's own witness, the actual Government chemist who conducted the testing for Customs, admitted that all the properties listed in T.D. 66–23(13) for aviation gasoline had to be known to determine whether or not a substance was aviation gasoline. Therefore, we conclude that the Customs Court was correct in holding in this case that the classification of merchandise as motor fuel under TSUS 475.25 required that each of the properties listed in T.D. 66–23(13) be met.

Accordingly, for the reasons stated herein, the judgment of the Customs Court is *affirmed.*

---

**7.** See *Cities Service Oil Co. v. United States,* 16 Cust.Ct. 110, C.D. 994 (1946) (a petroleum derivative falling outside the viscosity standard for fuel oil was nonetheless classified as fuel oil because this deficiency could be compensated for by preheating the imported product).