**AMORIENT PETROLEUM CO., Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Court No. 83–9–01326.**

United States Court of International Trade.

April 17, 1985.

Blum, Nash & Railsback, Edward G. Modell, Washington, D.C., for plaintiff.

Richard K. Willard, Acting Asst. Atty. Gen., Washington, D.C., Joseph J. Liebman, Atty. in Charge, Intern. Trade Office, Commercial Litigation Branch, Judith M. Barzilay, New York City, for defendant.

RE, Chief Judge:

The question presented in this case pertains to the proper classification, for customs duty purposes, of 18,344,771 gallons of certain petroleum derivatives imported from South Korea and China, and described on the customs invoices as "gasoline."

The petroleum derivatives were entered at the port of Long Beach, California, and were classified by the Customs Service (Customs) as "motor fuels" under item 475.25 of the Tariff Schedules of the United States (TSUS). Hence, they were assessed with a duty of 1.25 cents per gallon.

Plaintiff protests this classification, contending that the petroleum derivatives are properly classified as "naphthas derived from petroleum, shale oil, or combinations thereof (except motor fuel)" under item 475.35 TSUS, dutiable at .25 cents per gallon.

The pertinent statutory provisions of the tariff schedules are as follows:

*General Headnotes and Rules of Interpretation*

10. *General Interpretive Rules.* For the purposes of these schedules—

(e) in the absence of special language or context which otherwise requires—

(i) a tariff classification controlled by use (other than actual use) is to be determined in accordance with the use in the United States at, or immediately prior to, the date of importation, of articles of that class or kind to which the imported articles belong, and the controlling use is the chief use, i.e., the use which exceeds all other uses (if any) combined;

Schedule 4,

*Part 10 Headnotes:*

2. For the purposes of this part—

(b) "Motor Fuel" (item 475.25) is any product derived primarily from petrole-

um, shale, or natural gas, whether or not containing additives, which is chiefly used as a fuel in internal-combustion or other engines.

*Classified under:*

Schedule 4, Part 10:

| | |
|---|---|
| 475.25 Motor Fuel .............. | 1.25¢ per gal. |

*Claimed Under:*

Schedule 4, Part 10:

| | |
|---|---|
| 475.35 Naphthas derived from petroleum, shale oil, natural gas, or combinations thereof (except motor fuel) ................... | 0.25¢ per gal. |

The question presented, therefore, is whether the petroleum derivatives imported by the plaintiff constitute "Motor Fuel," as classified by Customs, or "Naphthas derived from petroleum, shale oil, natural gas or combinations thereof (except motor fuel)," as contended by plaintiff. In order to decide this question, the court must consider "whether the government's classification is correct, both independently and in comparison with the importer's alternative." *Jarvis Clark Co. v. United States,* 733 F.2d 873, 878, *reh'g denied,* 739 F.2d 628 (Fed.Cir.1984). *See E.R. Hawthorne & Co. v. United States,* 730 F.2d 1490, 1490 (Fed.Cir.1984).

Contending that there is no triable issue of fact, both parties moved for summary judgment under Rule 56 of this Court. After examining the tariff schedules, relevant case law, affidavits, and lexicographic definitions, this Court has determined that the imported petroleum derivatives were properly classified by Customs as "motor fuel."

On November 9, 1982, after payment of customs duties of 1.25 cents per gallon on these petroleum derivatives, Amorient filed a protest with the Acting District Director of Customs on Terminal Island, California. When the protest was denied, Amorient filed this action.

Contending that there was no genuine issue of fact to be tried, plaintiff initially moved for summary judgment. It asserted that the petroleum derivatives had degrees

of unsaturation, which are measured according to "Bromine numbers," and Reid vapor pressures greater than those acceptable to the California Air Resources Board (CARB) for sale as gasoline in the South Coast Basin of California. Hence, plaintiff argued that the petroleum derivatives could not properly be classified as "motor fuel."

Plaintiff further stated that, in order to comply with the CARB regulations, so that the imported merchandise could be sold as motor fuel within the South Coast Basin of California, 12,967,918 gallons of the petroleum derivatives were mixed with naphtha, condensate, jet fuel, leaded and unleaded gasoline in tanks in Long Beach, California.

The petroleum derivatives in question have Bromine numbers which range from 62.4 to 92.4. The Reid vapor pressure of these derivatives ranges from 9.6 to 10.4 pounds per square inch. CARB motor vehicle fuel standards for the South Coast Basin of California prohibit the sale of any gasoline that has a degree of unsaturation greater than that indicated by a Bromine number of 30. CARB Regulations § 2250(a). Within the South Coast Basin between the months of April and October, CARB regulations also prohibit the sale of motor fuel with a Reid vapor pressure greater than 9 pounds per square inch. CARB Regulations § 2251.

In support of its motion, plaintiff submitted the affidavits of its Vice President, Richard T. Mulcahy, and of James J. Morgester, Chief of the Compliance Division of the California Air Resources Board. Both affiants averred that the petroleum derivatives in question could not lawfully have been sold as motor fuel in the South Coast Basin of California.

Based upon the fact that the petroleum derivatives in question could not be lawfully sold as motor fuel in the South Coast Basin, Amorient urged that these derivatives were improperly classified, and should have been classified and assessed duty under item 475.35, TSUS, as "naphtha." The plaintiff drew a distinction between petroleum products used *as* motor fuel, and those

used *in* motor fuel. It urged that, since the products in question could not be sold in the South Coast Basin as motor fuel, and instead were blended with other components to form a fuel acceptable for sale in the Basin, they should have been classified as "naphtha."

The defendant opposed the motion for summary judgment. It contended that whether the products in question could be lawfully sold as motor fuel in the South Coast Basin of California is irrelevant to the classification of the imports. Emphasizing that the chief use of the petroleum derivatives within the United States is controlling on the classification issue, the defendant claimed that there was an issue of material fact as to whether the products in question were usable as motor fuel. The defendant also maintained that petroleum derivatives containing lead were not classifiable as "naphtha" under item 475.35, and, thus, there was an additional factual question to be determined. Finally, the defendant contended that there was a question of fact as to whether those petroleum derivatives that were not blended to make a saleable motor fuel for the South Coast Basin, were later sold elsewhere as motor fuel.

In response to the defendant's contentions, the plaintiff stipulated that the petroleum derivatives in question are used primarily as motor fuel outside of the South Coast Basin of California, that there was lead in these derivatives, and that the portion of the shipment in question that was not blended to make gasoline for sale in the South Coast Basin was sold by Amorient as gasoline for use outside of the South Coast Basin. Having stipulated these facts, the plaintiff contended that there remained no material facts in dispute, and, therefore, urged summary judgment in its favor.

In response to the stipulations of the plaintiff, the defendant made a cross-motion for summary judgment. The defendant contended that since the product in question, by plaintiff's own admission, was used outside of the South Coast Basin chiefly as motor fuel, and that the remain-

der of the shipment not blended for use as motor fuel in the South Coast Basin was sold for use elsewhere as motor fuel, the product had been properly classified. In addition, the defendant contended that the presence of lead in the product precluded its classification as "naphtha." In essence, the defendant took the position that the regulations of a state prohibiting the sale of the petroleum derivatives in question as motor fuel in a limited geographic area were of no legal significance in the classification of the imported product.

On a motion for summary judgment, all ambiguities should be resolved, and all reasonable inferences should be drawn, in favor of the party against whom the summary judgment is sought. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); *Yamaha International Corp. v. United States*, 3 CIT 108, 109 (1982). If there are any material issues of fact, summary judgment is precluded. *Yamaha International, supra*, 3 CIT at 109; *S.S. Kresge Co. v. United States*, 77 Cust.Ct. 154, C.R.D. 76–6 (1976). In the case at bar, each side asserts there is no triable issue of fact.

The Court agrees that there is no material question of fact in dispute, and that, therefore, summary judgment is appropriate. Since the court has determined that the defendant's position is correct, judgment will issue for the defendant.

■ A question presented is whether a state regulation which limits or restricts the use of an imported product may preclude its classification according to its chief use in the United States. It is the holding of this Court that the chief use of the product in the United States is controlling as to classification under a chief use provision of TSUS, irrespective of any state law or regulation which may restrict its use within the state.

■ The *General Interpretive Rules* of the tariff schedules provide that in the absence of special language or content, "a tariff classification controlled by use (other than actual use), is to be classified in ac-cordance with the use in the United States ... and the controlling use is the chief use." 19 U.S.C.A. § 1202(10)(e)(i). The headnotes to part 10 of Schedule 4 define "motor fuel" as "any product derived primarily from petroleum, ... which is chiefly used as a fuel in internal-combustion or other engines." Actual use of a particular shipment is not dispositive. In order to prevail, plaintiff must prove that the chief use of the class or kind of merchandise in question is different than the use stated by Customs. *See, e.g., Pistorino & Co. v. United States*, 67 C.C.P.A. 1, 4, C.A.D. 1234, 607 F.2d 989, 992 (1979); *United States v. Colibri Lighters (U.S.A.) Inc.*, 47 C.C.P.A. 106, 109, C.A.D. 739 (1960); *H.J. Baker & Bros. v. United States*, 37 C.C.P.A. 52, 54, C.A.D. 419 (1949).

In *Pacific Guano & Fertilizer Co. v. United States*, 15 Ct.Cust.App. 218, C.A.D. 2866 (1927), the government classified certain agricultural products entered at San Francisco, California, and invoiced as "ground tankage," as manufactured articles not specifically provided for. The classification was based on the finding that the imported tankage was chiefly used in the United States as feed. The plaintiff challenged this classification, and contended that the tankage should have been properly classified as "fertilizer." At trial, the plaintiff was able to prove that the imported tankage was used as fertilizer, and that its chief use in California was as fertilizer. This evidence, however, was not sufficient to prove that its chief use in California as fertilizer was the product's chief use in the United States.

In the *Pacific Guano & Fertilizer Co.* case, the Court of Customs Appeals specifically stated that "[t]he fact that high-grade tankage is chiefly used in California as a fertilizer hardly justifies the conclusion that such tankage is chiefly used *in the United States* for that purpose." *Id.* at 227 (emphasis in original). The court also concluded that the actual use of the particular merchandise was not determinative of its classification under the tariff schedules. *Id.* at 228. The court upheld the government's classification, and emphasized that

it is the product's chief use in the United States that controls its classification for tariff purposes.

The holding in the *Pacific Guano & Fertilizer Co.* case has been consistently followed in subsequent cases. *See, e.g., United States v. Colibri Lighters (U.S.A.) Inc.,* 47 C.C.P.A. 106, 109, C.A.D. 739 (1960); *H.J. Baker & Bros. v. United States,* 37 C.C.P.A. 52, 54, C.A.D. 419 (1949); *Bangor & Aroostook Railroad Co. v. United States,* 20 C.C.P.A. 96, 100, T.D. 45724 (1932). For example, in *S.S. Kresge Co. v. United States,* 28 Cust.Ct. 373, Abstr. 56297, *app. dismissed,* 40 C.C.P.A. 209 (1952), the court stated: "Chief use of a class of merchandise is neither proven nor refuted by testimony that in certain local areas in the United States the merchandise has but one use and no other, unless it also be established, as a fact, that elsewhere in the United States it is not commercially known." *Id.* at 375.

Plaintiff relies on *United States v. Exxon Corp.* 66 C.C.P.A. 129, C.A.D. 1233, 607 F.2d 985 (1979), for the proposition that petroleum derivatives suitable for use *in* motor fuels are not dutiable as petroleum derivatives suitable *as* motor fuels. In *Exxon,* the Court of Customs and Patent Appeals stated that "the statutory definition of motor fuel contained in TSUS Schedule 4, Part 10, headnote 2(b) determines what is or is not a motor fuel." *Id.* at 133, 607 F.2d at 989. Thus, the court distinguished between petroleum derivatives suitable for use *in* motor fuels and those suitable for use *as* motor fuels, and held that only the latter are properly classifiable as motor fuel. *Id.* at 133, 607 F.2d at 988. *See California Oil Co. v. United States,* 29 Cust.Ct. 44, 47, C.D. 1442 (1952). The *Exxon* court then determined that the petroleum products in that case were not suitable for use as motor fuel because the 10% distillation temperature of those particular petroleum derivatives was too high to start a motor. *Id.,* 607 F.2d at 988. In short, since the product was physically incapable of being used as motor fuel without modification or blending, it could not be classified as motor fuel.

■ In contrast, the imported product in this case is clearly capable of being used as a motor fuel. Indeed, plaintiff has stipulated that its use as motor fuel is its chief use in the United States. Furthermore, nearly one third of the shipment in question was sold for use outside of the South Coast Basin of California as motor fuel. Nevertheless, plaintiff insists that the local restriction on the use of motor fuel, which CARB places upon those fuels to be used in the South Coast Basin of California, should determine the classification of this shipment. On this reasoning, plaintiff contends that the shipment in question should be classified as "naphthas ... (except motor fuels)."

■ There is no basis for plaintiff's contention that the chief use of this particular shipment in California proves that it should have been classified as other than "motor fuel." The Tariff Schedules classify these petroleum derivatives by their chief use in the United States. Since item 475.25 is a chief use designation, and the chief use of the product in question concededly is as motor fuel, there is no question of fact or law as to the correctness of the classification by Customs of the products in question. While state laws or regulations governing use of a product may constitute relevant evidence, when the product's chief use in the United States is in dispute, they are of no legal significance for customs duty purposes when, as in this case, the product's chief use in the United States is established.

Plaintiff contends that the *Pacific Guano* and *S.S. Kresge* decisions are not controlling because in those cases there were no legal restrictions on the use of the imported merchandise in the particular area, but merely the determination or choice by the importer to put the merchandise to a use other than its chief use in the United States. Plaintiff's argument is not persuasive. While it is true that in *Pacific Guano* and *Kresge* the local uses were not mandated by local laws or regulations, the holdings of those cases are clear in their

rejection of any standard other than *chief use in the United States* as controlling on the issue of the tariff classification of the importation.

Article I, section 8 of the United States Constitution mandates that "all Duties, Imposts, and Excises shall be uniform throughout the United States." U.S. Const. Art. I § 8 cl. 1. Congress has gone to great lengths to establish a comprehensive administrative and judicial mechanism to execute and enforce the uniform and fair application of the customs laws of the United States. Indeed, a primary purpose or function of this Court is to ensure that the administrative agencies with jurisdiction over imports apply the law consistently and uniformly. *See, e.g.,* H.R.Rep. No. 1235, 96th Cong., 2d Sess. 18–19 (1980). If this Court were to adopt the interpretation or view of the law urged by the plaintiff, the result would be that similar imports could be assessed different duties at different ports of the United States. This result would be in direct conflict with the constitutional mandate of national uniformity in the administration of the customs laws of the United States.

Whether or not this case should be considered one of first or novel impression, the plaintiff's position is untenable since it is contrary to national policy. Plaintiff's contention would require Customs to refrain from classification of imported petroleum derivates until each shipment's ultimate use was determined. This determination would have to be based on the destination of each particular shipment. CARB regulation § 2251 contains five different localized restrictions as to acceptable Reid vapor pressure based upon time of year, and the particular locality in which the gasoline is to be used. Plaintiff's plan would therefore require the Customs Service to classify the shipments to these areas differently from other shipments, as well as differently from shipments to the same areas at different times of the year.

The second difficulty with plaintiff's proposal is that it would allow importers to store their imports in areas where the prod-

ucts perhaps could be classified as "naphthas." They could thus receive the benefit of a lower tariff rate, and later sell their imports as gasoline in areas where the restrictions did not exist. In response, the Customs Service would either have to maintain continuous scrutiny over imports assessed at the lower tariff rate, or delay collecting duties until the imports were used. Either procedure would be burdensome and impractical.

It is well established that, when the tariff schedules designate a classification according to chief use, use is to be determined as of the date of importation or immediately prior thereto. *E.g., Randolph Rand Corp. v. United States,* 53 C.C.P.A. 24, 26–27, C.A.D. 871 (1966); *United States v. C.S. Emery & Co.,* 53 C.C.P.A. 1, 6, C.A.D. 868 (1966); *United States v. Baltimore and Ohio R.R. Co.,* 47 C.C.P.A. 1, 4, C.A.D. 719 (1959). Furthermore, it is beyond question that classification of imported merchandise must rest upon its condition as imported. *E.g., Carrington Co. v. United States,* 61 C.C.P.A. 77, 81, C.A.D. 1126, 497 F.2d 902, 905 (1975); *United States v. Baker Perkins, Inc.,* 46 C.C.P.A. 128, 131, C.A.D. 714 (1959). The fact that plaintiff intended to, and later did, blend some of the imported petroleum derivatives with other materials is irrelevant if the chief use in the United States of the imported merchandise at the time of importation was as motor fuel.

In conclusion, the tariff schedules make no provision for localized tailoring of petroleum classifications as suggested by the plaintiff. Headnote 2(b) states that motor fuel is "any product ... which is chiefly used as a fuel in internal-combustion or other engines." The cases cited, as well as the General Interpretive Rules, leave no doubt that tariff classifications controlled by use, other than actual use, are to be determined in accordance with the chief use in the United States, not in any particular locality. Thus, in the case at bar, there is no question as to the validity of the government's classification of the imported merchandise.

Plaintiff has failed to establish that the applicable standard for classification of its petroleum derivatives is anything other than the chief use of the product in the United States. The fact that the State of California has made a legislative determination that petroleum derivatives imported by plaintiff are not permissible motor fuels in certain limited geographic areas does not negate the fact that the chief use of these substances in the United States is as motor fuel.

The plaintiff's proposed classification of the merchandise is as "[n]aphthas derived from petroleum ... (except motor fuel)" under item 475.35. This proposed item expressly excludes motor fuel. Since the imported merchandise has been determined to be motor fuel, the merchandise cannot be classified as naphtha.

For the foregoing reasons, it is the determination of this Court that the imported merchandise was properly classified by Customs as motor fuel.

Defendant's cross-motion for summary judgment is granted, the plaintiff's motion is denied, and the action is dismissed. Judgment will issue accordingly.