**BELCREST LINENS, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**Court No. 79–6–00953.**

United States Court of International Trade.

Oct. 25, 1983.

---

Mandell & Grunfeld, New York City (Steven P. Florsheim, New York City, at the trial and on brief), for plaintiff.

J. Paul McGrath, Asst. Atty. Gen., Washington, D.C. (Joseph I. Liebman, Commercial Litigation Branch and Saul Davis, New York City, at the trial and on brief), for defendant.

BOE, Judge:

The subject merchandise in the above-entitled action consisting of embroidered cotton (percale) pillowcases, was classified during the years 1976–1977 under item 363.01 of the Tariff Schedules of the United States (TSUS). In so doing, the customs officials found that the said merchandise was a product of the People's Republic of China (China) and pursuant to General Headnote 3(e), TSUS, assessed duty thereon at the column 2 rate of 90% ad valorem.[1]

The plaintiff does not contest the classification of the subject merchandise under item 363.01, TSUS, but contends that the merchandise was a product of Hong Kong. Accordingly, plaintiff claims that the proper assessed duty to be at the column 1 rate of 34% ad valorem.

At the trial of the instant action stipulations entered into between counsel for the respective parties were offered in evidence and received by the court. The provisions thereof provide:

## STIPULATION

1. The imported merchandise consists of pillowcases shipped from Hong Kong to the United States.

2. The imported pillowcases resulted from the following processes performed in the People's Republic of China ("China"):

(a) Percale, a cotton fabric, was manufactured by, *inter alia*, a weaving process, in widths of approximately 40";

(b) The piece goods (bolts of fabric) were laid out on a long table. A stencil was placed on top of the fabric and

---

1. Section 5 of the Trade Agreements Extension Act of 1951 removed imports from communist countries from the application of reduced rates of duty. By Presidential Proclamation issued August 1, 1951, Harry S. Truman further defined the included articles as those "imported directly or indirectly into the United States" from nations under Communist domination and control. The Tariff Schedules of the United States in 1976–1977 included General Headnote 3(e) which replicates the language of the 1951 Presidential Proclamation:

(e) *Products of Communist Countries.* Notwithstanding any of the foregoing provisions of this headnote, the rates of duty shown in column numbered 2 shall apply to products, whether imported directly or indirectly, of the following countries and areas pursuant to section 401 of the Tariff Classification Act of 1962, to section 231 or 257(e)(2) of the Trade Expansion Act of 1962, or to action taken by the President thereunder:

    Albania
    Bulgaria
    China (any part of which may be under Communist domination or control)

   *    *    *    *    *    *

The bilateral trade treaty of 1979 granted Chinese goods most favored nation status subject to a column 1 rate of duty. Agreement on Trade Relations, July 7, 1979, United States—People's Republic of China, 31 U.S.T. 4651, T.I.A.S. 9630.

inked, at pre-determined intervals, of approximately 33″, for:

(1) an embroidery pattern of flowers or birds;

(2) cutting marks to indicate the precise point at which the fabric is to be cut at a later time; and

(3) scalloping—which is a design of a continuous series of circle segments forming the border along one edge of the fabric.

(c) The piece goods were then embroidered on the stencilled pattern of flowers or birds;

(d) The piece goods were then folded and shipped to Hong Kong.

3. A "reconstructed," illustrative sample of the piece goods, as shipped from China to Hong Kong is submitted with and made a part of this stipulation as Joint Exhibit 1. Joint Exhibit 1 was reconstructed from pillow cases [sic] cut apart and sewn into a continuous length, and marked with ink to show the cutting marks and scallop marks. Exhibit 1 differs from the merchandise described in paragraph 2 as to length, width, and possibly, fabric and embroidery pattern.

4. The imported pillowcases resulted from the following processes performed in Hong Kong:

(a) The piece goods were laid out on a long table, and cut to size at the pre-determined ink cut-marks;

(b) One edge was scalloped on the pre-stencilled scallop marks with colored thread;

(c) The merchandise was folded in half and sewn along 2 edges;

(d) These articles were then turned inside out, placed in a container, and moistened with water and a whitener;

(e) The merchandise was pressed, folded, wrapped, and packaged.

5. A sample of a pillow case [sic] that is the same in all material respects to the subject merchandise is submitted with and made a part of this stipulation as Joint Exhibit 2.

6. Plaintiff has no knowledge of the time, cost, or labor comparisons for the processes performed in Hong Kong and China.

### SUPPLEMENTAL STIPULATION

7. The merchandise exported from China was purchased by plaintiff.

8. With respect to the merchandise exported from China, plaintiff is unaware of any actual use of such merchandise other than to be made into pillowcases.

The issue to be determined in the instant action is whether the subject merchandise is a product of China and, pursuant to General Headnote 3(e), TSUS, subject to the column 2 rate of duty of 90% ad valorem, or the product of Hong Kong and, accordingly, subject to the column 1 rate of duty.

■ It is a general proposition of Customs law that "[m]erchandise imported from one country, being the growth, production, or manufacture in another country, must be appraised at its value in the principal markets of the country from which immediately imported ..." *United States v. G.W. Sheldon & Co.*, T.D. 42, 541, 53 Treas.Dec. 34, 36 (1928). When, however, merchandise is transported from Country A (the country of origin) to Country B (an intermediate country), Country A is looked upon as the country of exportation *only* if from all of the facts under determination it appears that:

(1) No part of the merchandise was intended for diversion into the commerce of the intermediate country;

(2) None of the goods were, in fact, diverted into the commerce of the intermediate country;

(3) A contingency of diversion did not exist; and

(4) None of the merchandise was in any way treated, processed, altered, manipulated or changed in character in the intermediate country.

*Cardinal Glove Inc. v. United States*, 4 CIT ——, Slip Op. 82–59 (July 22, 1982); *Hospitaline, Inc. v. United States*, 48 Cust.Ct. 563 (1962), *aff'd* 50 Cust.Ct. 556

**1152**

(1963); *United States v. F.W. Hagemann,* 39 C.C.P.A. 182 (1952); Customs Service Decision 79–186, 13 Cust.B. & Dec. 1253 (1978); *Tower & Sons v. United States,* T.D. 3535, 67 Treas.Dec. 1358 (1935).[2]

■ The provisions of General Headnote 3(e), however, impose a stricter test in defining products originating from communist countries. In order to preclude the possibility that products of communist or communist-dominated countries might be transshipped through a non-communist intermediate country in order to avoid a higher column 2 rate of duty, the provisions of General Headnote 3(e) applied to products, *whether imported directly or indirectly from communist countries.*

In the case of *Chemo Puro Mfg. Co. v. United States,* 34 Cust.Ct. 8, 146 F.Supp. 178 (1954), this court first considered the provisions of General Headnote 3(e) with respect to the importation of tannic acid produced in the United Kingdom out of nutgalls imported from China. Determining that the imported tannic acid was a product of the United Kingdom and not of China, the court pointed out that the tannic acid had been given a new identity definite and distinct from nutgalls, bearing a new name, use and tariff status.

Similarly, this court in *F.W. Myers & Co. v. United States,* 36 Cust.Ct. 5 (1955) held that an advanced drug compound manufactured in Canada from a crude drug originally shipped from China to England and thence to Canada was a product of Canada. The raw materials, although originating in China, were deemed by the court to have

been processed into an entirely new product in Canada.

Without reference to the foregoing decisions our appellate court first considered the application of General Headnote 3(e) in relation to a determination of the country of exportation in *United States v. Hercules Antiques, The Danwill Co.,* 44 C.C.P.A. 209 (1957). In pointing out the difficulty in adopting uniform or exact standards for applying General Headnote 3(e), the court stated: [3]

It would be difficult, if not impossible, to define exact standards for determining the duration of stay of merchandise in an intermediate country, the nature of the transactions to which it is subjected there, and other circumstances necessary to divest it of its status as an import, direct or indirect, from the Communist-dominated country in which it originated. At 212.

In holding that evidence was insufficient to establish that merchandise originating from Czechoslovakia, sold in Holland and thence imported into the United States was not imported "directly or indirectly" from Czechoslovakia, the appellate court stated:

However, we are of the opinion it must be established by appropriate evidence that the merchandise has actually become a *bona fide* part of the commerce of the intermediate country. (Italics in original; emphasis added.) *Id.* at 212–13.

The standard enunciated by our appellate court in *Hercules* was followed by this court in *Couture Fabrics, Ltd. v. United*

**2.** The defendant, citing *Texas Instruments, Inc. v. United States,* 69 C.C.P.A. ——, 681 F.2d 778 (1982), contends that the legal standard to be used in the instant action "is whether that article had been substantially transformed into a new and different article of commerce." The defendant is misguided in its generalized characterization of that decision.

In *Texas Instruments* the court determined that the assembly and encapsulation of certain components in Taiwan resulted in products "produced in the beneficiary developing country" and thereby within the provisions of 19 C.F.R. 10.177(a)(2):

(2) *Substantially transformed in the beneficiary developing country into a new and dif-*

ferent article of commerce. Thus, it is clear that in the *Texas Instruments* decision the tests specifically required by the customs regulations included the substantial transformation standard.

*See* quotation from *Hercules* in this opinion at page 1152 relating to General Headnote 3(e).

**3.** The court in *Hercules* further pointed out that the alteration of goods in an intermediate country, as in *Camera Specialty Co. and Rohner Gehrig & Co. v. United States,* 34 Cust.Ct. 27 (1955), distinguished that decision from the holding in *Hercules.*

*States*, 41 Cust.Ct. 369 (1958). This court found that certain silk goods imported into the United States from China, withdrawn without the payment of duty, exported to Switzerland, and subsequently returned to the United States had become a *bona fide* part of the commerce of Switzerland because Swiss customs duties were paid on the merchandise.

In *Moresco Corp. v. United States*, 63 Cust.Ct. 295 (1969), this court determined that the addition in West Germany of "stabilizing" chemicals to a chemical compound produced in East Germany was not sufficient to cause the product to become one of West Germany. The court, recognizing the decisions in *Chemo Puro, F.W. Myers* and *Hercules* concluded:

> Similarly, in the case at bar, there is no showing that the imported trichloroethylene was ever sold or offered for sale in West Germany. It further appears that since it arrived in West Germany in a stabilized state, it was transported to the United States without any change in character in West Germany. The addition of more stabilizers in West Germany cannot be considered a process of manufacture so as to constitute the trichloroethylene a product of West Germany. In our opinion, the record herein warrants a finding that the merchandise here in question had not actually become a *bona fide* part of the commerce of West Germany so as to entitle it to the reduced rate of duty claimed by the plaintiff. (Italics in original; emphasis added.) At 302.

In the instant action, the stipulated facts indicate that the subject merchandise underwent a process which changed its character from an embroidered bolt of percale fabric to a pillowcase in the intermediate country of Hong Kong. It is acknowledged that the woven piece goods originating in China were 40″ wide and marked for cutting at a later date and in a subsequent process. However, the process performed in Hong Kong—cutting the fabric at the determined lengths, scalloping the border on one edge of the fabric, hemming and the sewing along two edges of the piece goods—caused a change in the character and identity of a bolt of woven cotton cloth into an article designed specifically for the purpose of enclosing a pillow. The process of altering and manipulating the bolt of woven fabric shipped from China resulted in such a changed character or identity of the merchandise so as to become the product of Hong Kong.

Joint Exhibits 1 and 2 patently evidence to the court the change in the character and identity of Exhibit 1 resulting from its further processing in Hong Kong. The embroidered pillowcase, Exhibit 2, indeed is an article different in appearance, identity and use from the bolt of embroidered cotton fabric, Exhibit 1. An exhibit may be a potent witness. *Marshall Field & Co. v. United States*, 45 C.C.P.A. 72 (1958); *Texas Instruments, Inc. v. United States*, 1 C.I.T. 236, 518 F.Supp. 1341 (1981).

The defendant, however, has placed its reliance on certain court decisions which clearly do not embody the issues of the instant action. Citing *Doherty-Barrow of Texas, Inc. v. United States*, 3 C.I.T. 228 (1982) and *Lee Enterprises, Inc. v. United States*, 84 Cust.Ct. 208 (1980), the defendant contends that the subject merchandise was substantially completed at the time of its shipment from China and, in fact, constituted unfinished pillowcases. Citing *Uniroyal, Inc. v. United States*, 3 C.I.T. 220, 542 F.Supp. 1026 (1982), the defendant further contends that no substantial transformation of the merchandise occurred in Hong Kong and, accordingly, the subject merchandise obtained its status as an unfinished pillowcase in China.

The tests as to whether an article is *finished or unfinished* or *substantially transformed* in the course of its shipment to an intermediate country have not been used in the determination of the country of exportation. In light of our appellate court's reluctance to adopt any exact standard or standards in determining the applicability of General Headnote 3(e) (as evidenced by the aforecited quotation from *Hercules* ), decisions construing the mark-

ing statute (19 U.S.C. § 1304) and customs regulations relating thereto or General Interpretative Rule 10(h), TSUS, are not controlling.

Suffice it to say, however, in the opinion of this court the change of identity and the use of the subject merchandise as the result of its processing in Hong Kong, in fact, was of such a nature that it would have met the requirements of the substantial transformation test had the court used the test urged by the defendant.[4]

From the stipulated facts and the Joint Exhibits 1 and 2 presented herein, this court is of the opinion that the subject merchandise at the time of importation into the United States was a product of Hong Kong and not a product of China subject to the provisions of General Headnote 3(e), TSUS. Accordingly, the subject merchandise must be classified under item 363.01, TSUS, at the column 1 rate of duty of 34% ad valorem.

Let judgment be entered accordingly.

---

**4.** This court's reference to the substantial transformation test, relied upon by the Government in *Cardinal Glove Co.,* emphasized that the change in the identity of the subject merchandise therein was of such a nature that it would meet the requirements of the substantial transformation test used in connection with the marking statute.