**BELCREST LINENS, Appellee,**

v.

**The UNITED STATES, Appellant.**

**No. 84–734.**

United States Court of Appeals,
Federal Circuit.

Aug. 21, 1984.

Joseph I. Liebman, New York City, argued for appellant. With him on the brief were Richard K. Willard, Acting Asst. Atty. Gen., Washington, D.C., David M. Cohen, Director and Saul Davis, New York City.

Steven P. Florsheim, New York City, argued for appellee. With him on the brief was Robert B. Silverman, New York City.

Before FRIEDMAN, KASHIWA, and MILLER, Circuit Judges.

KASHIWA, Circuit Judge.

This is an appeal from a decision of the Court of International Trade, 573 F.Supp. 1149 holding that the imported merchandise, pillowcases, was a "product of Hong Kong" subject to an assessed duty rate of 34% ad valorem and not a "product of" the Peoples Republic of China which would cause the merchandise to be assessed with 90% ad valorem duty. We affirm.

## Background

The parties stipulated to the following facts. The imported merchandise consists of pillowcases shipped from Hong Kong to the United States. The pillowcases were produced from percale, a cotton fabric, woven in China into a bolt of cotton. In China the bolts of fabric (piece goods) were stenciled with: (1) an embroidery design, (2) cutting marks, and (3) a scalloped edge. The piece goods were then embroidered on the embroidery design and shipped to Hong Kong. In Hong Kong the piece goods were cut into individual pieces of fabric at the inked cut marks. One edge of the fabric was cut and scalloped with colored thread on the inked scallop marks. The pieces were then folded in half and two of the sides were sewn together. The merchandise was then moistened with water and a whitener, pressed, folded, packaged, and sent to the United States. Appellee also stipulated that it had no knowledge of the time, cost or labor comparisons for the processes performed in Hong Kong and China; that it purchased the merchandise exported from China; and that it was unaware of any use of the merchandise other than to be made into pillowcases.

Upon importation into the United States, the pillowcases were classified under item 363.01 Tariff Schedules of the United States, such classification not being contested. However, pursuant to General Headnote 3(e) the merchandise was assessed at a column 2 duty rate of 90% ad valorem as a "product of" China, whereas appellee, the importer, asserts that the merchandise should be assessed at a column 1 duty rate of 34% ad valorem as a product of Hong Kong. The pertinent statutory provisions provide:

General Headnotes and Rules of Interpretation:

\*　　\*　　\*　　\*　　\*　　\*

3. *Rates of Duty.* The rates of duty in the "Rates of Duty" columns num-

bered 1 and 2 of the schedules apply to articles imported into the customs territory of the United States as hereinafter provided in this headnote:

\*    \*    \*    \*    \*    \*

(e) *Products of Communist Countries.* Notwithstanding any of the foregoing provisions of this headnote, the rates of duty shown in column numbered 2 shall apply to products, whether imported directly or indirectly, of the following countries and areas pursuant to section 401 of the Tariff Classification Act of 1962, to section 231 or 257(e)(2) of the Trade Expansion Act of 1962, or to action taken by the President thereunder:

\*    \*    \*    \*    \*    \*

China (any part of which may be under Communist domination or control).

\*    \*    \*    \*    \*    \*

(f) *Products of All Other Countries.* Products of all countries not previously mentioned in this headnote imported into the customs territory of the United States are subject to the rates of duty set forth in column numbered 1 of the schedules.

Relying on case law interpreting Section 5 of the Trade Agreement Extensions Act of 1951 and Presidential Proclamation 2935, 16 Fed.Reg. 7635, the predecessor provisions to General Headnote 3(e),[1] the trial

court found that the imported merchandise was a product of Hong Kong. In reaching this conclusion, the court found that the processes performed in Hong Kong caused a change in the "character and identity" of the merchandise and that the pillowcases were articles "different in appearance, identity, and use" from the bolt of cloth. Despite the government's arguments, the court found decisions construing the marking statute, applying a "substantial transformation" test, and General Interpretive Rule 10(h) not to be controlling. The court, nevertheless, concluded that the change of identity and use of the subject merchandise as a result of its processing in Hong Kong, in fact, met the requirements of the substantial transformation test.

## I

The only issue before us is whether the merchandise—pillowcases—imported into the United States is a "product of" China or a "product of" Hong Kong. While General Headnote 3(e) does not define the term "product of," it does refer to Section 231 of the Trade Expansion Act of 1962 and Section 405(a) of that Act defined "product of" a given nation as an article which is the "growth, produce or manufacture of such country or area." [2] Case law also establishes that the term "products of" at the least includes manufactured articles of such country or area, *United States v. Castle, Gottheil & Overton,* 5 Ct.Cust.

---

1. Section 5 of the Trade Agreements Extension Act of 1951 provided that:

   As soon as practicable, the President shall take such action as is necessary to suspend, withdraw or prevent the application of any reduction in any rate of duty, \* \* \* to imports from the Union of Soviet Socialist Republics and to imports from any nation or area dominated or controlled by the foreign government or foreign organization controlling the world Communist movement.

   \*    \*    \*    \*    \*    \*

   Presidential Proclamation 2935 implementing Section 5 provided that:

   \* \* \* For the purposes of this part the term "imports from such nations and areas" *shall mean articles imported directly or indirectly into the United States from nations or areas specified in an effective notification, but shall not in any case include articles the growth, produce, or*

*manufacture of any other nation or area.* (Emphasis added.)

Section 231 of the Trade Expansion Act of 1962, Pub.L. 87–794 provided that products of Communist countries would not be entitled to a reduced rate of duty. Section 257(e)(1) of that Act repealed Section 5 of the Trade Agreements Extension Act of 1951. However, Section 257(e)(2) of the Act provided that action taken by the President under Section 5 shall be considered as taken under Section 231.

2. Section 231 was repealed by the Trade Act of 1974. Pub.L. 93–618. However, Section 401 of the Trade Act of 1974 retained the requirements of Section 231 and Section 601(8) of that act again defines a product of a country or area as "an article which is the growth, produce or manufacture of such area." 19 U.S.C. §§ 2431, 2481(8).

Appls. 366 (1914) although it may in fact be a more inclusive term, *United States v. Samuel Dunkel & Co., Inc.*, 33 CCPA 60 (1945). Therefore, we agree with the first part of the government's argument, that for purposes of Headnote 3(e), the term "product of" refers to the "growth, produce or . manufacture" of a given nation.

The government goes on to argue that the trial court erred in relying on case law interpreting Section 5 of the Trade Agreement Extension Act of 1951 and Presidential Proclamation 2935 implementing the Act, because the language of these provisions referred to "articles imported directly or indirectly" from a Communist nation rather than "products, whether imported directly or indirectly" of a Communist nation. The government contends that in determining whether a country is a "country of production" or "country of manufacture," country of origin criteria apply, and that in ascertaining whether an intermediary country where processes are performed on merchandise is the country of origin for tariff purposes, a "substantial transformation" of the merchandise must have occurred in the intermediary country. Therefore, the government contends that the trial court erred when it concluded that there was a change in the appearance, character, identity, and use of the merchandise in Hong Kong.

We, however, conclude that case law interpreting Presidential Proclamation 2935 is relevant. Although the proclamation did not refer to "products of" a Communist country, it did state that the higher rate would not apply to articles which were the "growth, produce or manufacture" of another area.[3]

The case most directly on point is *Chemo Pure Mfg. Co. v. United States*, 34 Cust.Ct. 8 (1954), wherein Chinese nutgalls were imported into the United Kingdom and processed into tannic acid. In holding that the

United Kingdom was the country of exportation, the court stated:

> The merchandise here in question, in its condition as imported, is tannic acid, not nutgalls. The identity of the nutgalls, produced in China, has been lost, and a new product with a new name, a new use, and a distinct tariff status has been produced in the United Kingdom, the country of exportation. The imported tannic acid is, therefore, an article the growth, produce, or manufacture of the United Kingdom and dutiable as such. 34 Cust.Ct. at 11–12.

This test, that an article is the "growth, produce or manufacture" of an intermediary country if as a result of processes performed in that country a new article emerges with a new name, use or identity, is essentially the test used by the courts in determining whether an article is a manufacture of a given country under other areas of customs law. For example, in *Anheuser-Busch Association v. United States*, 207 U.S. 556, 28 S.Ct. 204, 52 L.Ed. 336 (1932), the Court held that certain corks imported from Spain into the United States where they were subjected to a cleansing process were not manufactured in the United States for purposes of the drawback provisions of Section 25 of the Tariff Act of 1850.[4] The Court recognized the difficulty of defining the term "manufacture" with specificity. The Court, however, went on to state:

> Manufacture implies a change, but every change is not manufacture, and yet every change in an article is the result of treatment, labor and manipulation. But something more is necessary, * * *. There must be transformation; a new and different article must emerge, "having a distinctive name, character or use." 207 U.S. at 562, 28 S.Ct. at 206–207.

---

**3.** *See supra* ftn. 1.

**4.** Section 25 of the Tariff Act of 1850 provided that:
> * * * where imported materials on which duties have been paid, are used in the manufacture of articles manufactured or produced in the United States, there shall be allowed on the exportation of such articles a drawback * * *.

■ While subsequent cases have recognized the fact that the term "produced in" may in fact encompass the processing of articles which do not rise to the level of "manufacturing," and while the Customs Service itself has recently stated that the above definition of manufacture is a restrictive one, C.S.D. 82–67, 16 Cust.Bull. 801 (1982), courts have been reluctant to lay down specific definitions in this area of the law other than to discuss the particular facts of cases under the particular tariff provisions involved. *See, e.g., Roland Freres, Inc. v. United States*, 23 CCPA 81 (1935); *United States v. Samuel Dunkel & Co., Inc., supra.* We, therefore, cannot agree with the government that the trial court applied an incorrect legal standard when it concluded that the merchandise was a "product of" Hong Kong because the processes performed in Hong Kong changed the character, appearance, identity, and use of the merchandise from a bolt of woven fabric into a pillowcase.

■ The government also argues that the trial court erred when it failed to utilize the "substantially transformed" test as developed under other areas of customs law in determining whether the imported pillowcases were products of China or Hong Kong. Although we decline to advance a definition of this term for all purposes, particularly because the implementing regulations under various tariff provisions define the term differently,[5] it is clear that a "substantial transformation" occurs when as a result of a process an article emerges, having a distinctive name, character or use, in essence the definition of manufacture quoted above. *See, e.g., Uniroyal, Inc. v. United States*, 3 C.I.T. 220, 542 F.Supp. 1026 (1982), *aff'd per curiam* 702 F.2d 1022 (Fed.Cir.1983); *Texas Instruments, Inc. v. United States*, 681 F.2d 778 (CCPA 1982); *Midwood Industries, Inc. v. United*

*States*, 64 Cust.Ct. 499 (1970). Again, it is difficult to perceive the difference between this test and that used by the trial court, that there was a change in the appearance, character, identity and use of the involved merchandise. Moreover, the trial court specifically concluded that the merchandise was substantially transformed in Hong Kong.

The government challenges this conclusion on the ground that in order for there to be "a substantial transformation" of the merchandise, the processes performed in Hong Kong must have changed the article into one with a new tariff identity. The government argues that this did not occur in this case because the processes performed in Hong Kong merely finished an identifiable product, unfinished pillowcases. Therefore, there was no "substantial transformation."

First, we note that the government cites no case which stands for the proposition that a change in tariff identity is the sole criterion for determining whether a substantial transformation occurred. The government relies heavily on the *Chemo* case which it otherwise criticizes the trial court for citing. However, in *Chemo*, a change in tariff identity was only one of the factors considered. Moreover, the Court of Customs and Patent Appeals has specifically stated that:

> While the fact that by a manufacturing effort expended on an article its tariff status may have been changed is a proper matter to consider along with other circumstances in arriving at a conclusion as to whether the article has been "manufactured or produced", it certainly should not be a controlling consideration. *Rolland Freres, Inc. v. United States*, 25 CCPA 81 (1935).

---

5. For example, the regulation under the Generalized System of Preferences General Headnote 3(c)(ii), 19 U.S.C. § 1202, requires a constituent material to be "substantially transformed into a new and different article of commerce" for purposes of that provision, 19 CFR 10.117(a). Compare 19 CFR 134.d(1), implementing 19 U.S.C. § 1304(a), the marking statute, which provides

that: "If an imported article will be used in manufacture, the manufacturer may be the 'ultimate purchaser' if he subjects the imported article to a process which results in a substantial transformation of the article even though the process may not result in a new or different article."

Similarly, in the recent Customs Service decision 80–10, 14 Cust.Bull. 740, (1980), the question presented was whether Taiwan, where certain sweater parts were knit, or Hong Kong, where they were assembled, was the country of origin for tariff and marking purposes. In holding that Hong Kong was the country of origin, the Customs Service stated that the pertinent criteria for making this determination were whether a new and different article was created in Hong Kong, whether a new use resulted from the processing, and whether the article obtained a new identity. The decision went on to state:

In the instant situation, while all the components which account for the complete sweater or cardigan are produced in Taiwan and the unassembled garments would have the same tariff classification as the finished articles if imported into the United States together, this is not determinative of the country of origin of that merchandise. In *Doliff & Company, Inc. v. United States*, 81 Cust.Ct. 1, C.D. 4755 (July 7, 1978), the court stated that although certain processing did not result in a change in the tariff classification of the merchandise concerned, the processing did create a new and different article.

14 Cust.Bull. at 741.

The decision also stated that it was modifying a former ruling to reflect the position that the country where merchandise first becomes susceptible to its final tariff classification, whether assembled or unassembled, finished or unfinished, is a factor for consideration and not determinative in ascertaining country of origin of the merchandise.

We, therefore, cannot agree with the government's argument that the definitive issue in this case is whether the merchandise as it left China would be classified as unfinished pillowcases. Furthermore, we do not agree that in fact the articles were so dedicated to the use of pillowcases as they left China that they would be classified as unfinished pillowcases. There was evidence that the merchandise was capable of other commercial uses—woman's handbags and tops. *See, e.g., Avins Industrial Products Co. v. United States*, 515 F.2d 782 (CCPA 1975).

Finally, citing *Texas Instruments, Inc. v. United States*, 681 F.2d 778 (CCPA 1982), and *Uniroyal, Inc. v. United States*, 3 C.I.T. 220, 542 F.Supp. 1026 (1982), *aff'd per curiam* 702 F.2d 1022 (Fed.Cir.1983), the government contends that mere assembly operations do not constitute a substantial transformation. We, however, do not agree that the operations performed in Hong Kong were mere assembly operations. In determining whether the combining of parts or materials constitutes a substantial transformation, the issue has been the extent of the operations performed and whether the parts lose their identity and become an integral part of a new article. *See Adolphe Schwab, Inc. v. United States*, 62 Treas.Dec. 248, T.D. 45908 (1932), *aff'd*, 21 CCPA 116 (1933) (watch parts transformed into watches); *Carlson Industries*, 65 Cust.Ct. 474 (1970) (chair parts transformed into finished chairs).

For example, in *Uniroyal*, the trial court held that substantially complete shoes imported without outsoles were not substantially transformed by the attachment of outsoles. After stating that each case must be decided on its own particular facts, the court continued:

Examining the facts in the present case, the conclusion is clear that a substantial transformation of the upper has not occurred since the attachment of the outsole to the upper is a minor manufacturing or combining process which leaves the identity of the upper intact. Thus the upper—which in its condition as imported is already a substantially complete shoe—is readily recognizable as a distinct item apart from the outsole to which it is attached. And the manufacturing process performed by Stride-Rite is a minor assembly operation which requires only a small fraction of the time and cost involved in producing the uppers.

542 F.Supp. at 1029–30.

In the case at bar, as opposed to that of *Uniroyal*, the processes performed in Hong Kong were not minor assembly operations which left the identity of the merchandise imported from China intact. The bolts of cloth were cut, the pieces were scalloped, and then sewn with decorative stitching, and the sides were sewn up. As the trial court found, the identity of the merchandise changed as did its character and use: embroidered fabric was transformed into pillowcases which are clearly distinguishable in character and use from the fabric of which they were made. We, therefore, hold that the trial court correctly concluded that the merchandise in this case was a product of Hong Kong.

AFFIRMED.