## COASTAL STATES MARKETING, INC., Plaintiff,

### v.

## UNITED STATES, Defendant.

**Court No. 80–10–01632.**

United States Court of International Trade.

Sept. 18, 1986.

Freeman, Wasserman & Schneider (Bernard J. Babb, New York City, on the motion), for plaintiff.

Richard K. Willard, Asst. Atty. Gen., Washington, D.C., Joseph I. Liebman, Atty. in Charge, Intern. Field Office (Judith M. Barzilay, New York City, on the motion), for defendant.

CARMAN, Judge:

The issue in this case is the country of exportation of three entries of plaintiff's imported product, a mixture of gas oil from the Soviet Union and fuel oil from Italy. Plaintiff has moved for summary judgment, with defendant cross-moving for summary judgment. The Court determines that there are no genuine issues of material fact regarding whether the imported mixture is a new and different product and grants defendant's cross-motion for summary judgment.

## Facts

The parties' briefs and stipulation of facts reveal the following:

In January 1972 the M/T Tichi oil tanker took on approximately 12,341,419 metric tons of No. 2 gas oil at the port of Tuapse in the Union of the Soviet Socialist Republic. The gas oil was distributed among 25 of the vessel's 27 storage tanks. The vessel then proceeded to the Port of Milazzo in Italy, where approximately 12,117,839 metric tons of fuel oil having physical properties resembling No. 5 fuel oil were loaded into the same 25 tanks which contained the No. 2 gas oil from the Soviet Union and the oils were mechanically mixed. Shortly after the M/T Tichi was loaded in Italy, the vessel sailed for New York and arrived in port on approximately February 23, 1972, where the merchandise was unloaded and entered for consumption into the United States.

On March 2 and 9, 1979, the United States Customs Service (Customs) liquidated the subject entries, classifying the oil mixture under item 475.10, Tariff Schedules of the United States (TSUS), as residual fuel oil. Treating the product as commingled articles under General Headnote 7, TSUS,[1] however, Customs assessed duties on the oil of Soviet origin separately from that of Italian origin as required by General Headnotes 3(e) and 3(f) of the General Headnotes and Rules of Interpretation, TSUS.[2] Approximately 50.5 percent of the oil mixture, representing the amount loaded on the M/T Tichi in the Soviet Union, was assessed the duty rate of 0.5 cents per gallon applicable under Column 2 of the TSUS to products of Communist countries, while the remaining oil was assessed 0.25 cents per gallon, the rate of duty applicable under Column 1 to products of all other countries. Documentation provided by plaintiff enabled Customs to determine the precise amounts of oil originating from the two countries and accordingly assess duties at the different rates.

While the M/T Tichi was at the Port of Milazzo, Sayboltvan Duyn N.V., an independent marine bulk oil surveyor, took and analyzed a sample of the Russian No. 2 gas oil already loaded on the vessel, a sample of the Italian No. 5 fuel oil loaded into the vessel's tanks, and a sample of the resulting mixture after the No. 5 fuel oil was loaded. The results of the analyses were provided to the Court as attachments to the affidavit of Francis V. Elias, submitted as

1. General Headnote 7(a), TSUS, provides:
   7. Commingling of articles:
   (a) Whenever articles subject to different rates of duty are so packed together or mingled that the quantity or value of each class of articles cannot be readily ascertained by customs officers (without physical segregation of the shipment or the contents of any entire package thereof), by one or more of the following means—
   (i) sampling
   (ii) verification of packing lists or other documents filed at the time of entry, or
   (iii) evidence showing performance of commercial settlement tests generally accepted in the trade and filed in such time and manner as may be prescribed by regulations of the Secretary of the Treasury,
   The commingled articles shall be subject to the highest rate of duty applicable to any part thereof unless the consignee or his agent segregates the articles pursuant to subdivision (b) hereof.

2. General Headnote 3(e) of the General Headnotes and Rules of Interpretation, TSUS, provides as follows:

(e) *Products of Communist Countries.* Notwithstanding any of the foregoing provisions of this headnote, the rates of duty shown in column numbered 2 shall apply to products, whether imported directly or indirectly, of the following countries and areas pursuant to section 401 of the Tariff Classification Act of 1962, to section 231 or 257(e)(2) of the Trade Expansion Act of 1962, or to action taken by the President thereunder:

. . . .

Union of Soviet Socialist Republics and the area in East Prussia under the provisional administration of the Union of Soviet Socialist Republics.

General Headnote 3(f) of the General Headnotes and Rules of Interpretation, TSUS, provides as follows:

(f) *Products of All Other Countries.* Products of all countries not previously mentioned in this headnote imported into the customs territory of the United States are subject to the rates of duty set forth in column numbered 1 of the schedules.

part of plaintiff's motion for summary judgment.

In addition to the above facts, the parties have also stipulated that the American Society for Testing and Materials (ASTM) is a scientific and technical organization whose purpose is the development of standards on characteristics and performance of materials, products, systems and services. The parties agree that ASTM publishes standards containing, among other things, formally approved ASTM standard classifications, guides, practices, specifications, test methods, and terminology, and that ASTM standards have been referred to, relied upon, and applied as authoritative guidelines by the Customs Service and the courts in resolving questions of classification, where appropriate and relevant statutory requirements have permitted. *See*, for example, T.D. 66-23(13), 101 Treas.Dec. 94 (1966); P.R.D. 73-19, 7 Cust.Bull. 954 (1973); *United States v. Exxon Corporation, Chevron Oil Co.*, 66 CCPA 129, C.A.D. 1233, 607 F.2d 985 (1979); *J.D. Smith Interocean, Inc. v. United States*, 79 Cust.Ct. 99, C.D. 4719 (1977). The Court will therefore rely upon standards published by the ASTM in discussing the issues and will as well take judicial notice of other authoritative references. *See Van Gelder-Fanto Corp. v. United States*, 41 CCPA 90, C.A.D. 534 (1953).

## Discussion

The issue of substantial transformation arises in a variety of contexts within the administration of the customs laws. *See, e.g., National Juice Products Assn. v. United States*, 10 CIT ——, 628 F.Supp. 978 (1986) (country of origin marking requirements); *Torrington Co. v. United States*, 764 F.2d 1563 (Fed.Cir.1985), *aff'g* 8 CIT 150 (1985) (country of production for GSP treatment); *United States v. International Paint Co.*, 35 CCPA 87, C.A.D. 376

(1948) (country of manufacture or production for drawback purposes); and *Belcrest Linens v. United States*, 741 F.2d 1368 (Fed.Cir.1984), *aff'g* 6 CIT 204, 573 F.Supp. 1149 (1983) (country of exportation for purposes of Headnote 3(e), TSUS; duty applicable to products of Communist countries). Tests applied by the court in determining whether a product has been "substantially transformed" in the course of its progression through intermediate countries such that the country of origin for customs purposes is affected are not necessarily identical within the various contexts. *See, Belcrest Linens*, 6 CIT at 208–10, 573 F.Supp. at 1152–54; *National Juice Products*, 10 CIT at ——, 628 F.Supp. at 988–89, n. 14.

■ Further, the rule applicable when determining the country of exportation in cases involving merchandise from Communist countries is more stringent than that when determining the country of exportation generally. *See*, Sturm, *Customs Law & Administration, § 41.9 (3rd ed. 1986); United States v. Hercules Antiques, The Danwill Co.*, 44 CCPA 209, C.A.D. 662 (1957). So although the Court may consider the "substantial transformation test" as it has evolved under various statutes, only those decisions dealing with the determination of the country of exportation under Headnotes 3(e) are controlling. The courts, realizing the importance of focusing on the facts of each case, have refrained from setting out specific definitions in this area of the law. *Belcrest Linens v. United States*, 741 F.2d at 1372. Nevertheless, inquiries into whether an imported article is the "product of" a Communist country have appropriately centered upon changes in the character, appearance, identity or use of merchandise as a result of processes performed in intermediary countries. *See, e.g., id.* at 1371 (affirming lower court's application of this test).[3]

---

**3.** The Court of Appeals for the Federal Circuit noted the difficulty in perceiving how this test differs from the "substantial transformation test" used in other contexts. *Belcrest Linens*, 741 F.2d at 1372. This test, nevertheless, has its own lineage and incorporates case law interpreting Section 5 of the Trade Agreement Extension Act of 1951 and Presidential Proclamation 2935 implementing the Act. *Id.* at 1371; *see, also, United States v. Hercules Antiques, The Danwill Co.*, 44 C.C.P.A. 209 (1957).

Regardless of the specific formulation of the rule applicable in this case, plaintiff contends its imported fuel oil was a new and different product created in Italy by mixing the Russian No. 2 gas oil with the Italian No. 5 fuel oil. Plaintiff concludes the Russian oil was substantially transformed in Italy and Italy is the country of exportation for duty assessment purposes.

The factual basis of plaintiff's argument is that the mixing of the oils resulted in a fuel oil having qualities different from those of the original Russian gas oil. It was determined the blended oil had a specific gravity of 0.8678, while that of the Russian oil was 0.8310; the sulphur content of the blend was 0.33, while that of the Russian oil was 0.19; the flashpoint of the blend was 73°C., while that of the Russian oil was 68°C.; and the pourpoint of the blend was 25°C., while that of the Russian oil was .10°C. In addition, the kinematic viscosity of the blended oil at 100°F. was 72. As confirmed by the parties' stipulation, these qualities place the oil blend in the category of Grade No. 5 (heavy) or No. 6 fuel oil, well beyond the requirements for Grade No. 2 oil, which the Russian gas oil satisfied. *See, 1985 Annual Book of ASTM Standards, Petroleum Products, Lubricant and Fossil Fuel, Volume 5.01. Petroleum Products and Lubricants* 207 (Table 1, Detailed Requirements for Fuel Oil) [hereinafter cited as *ASTM Standards* ].

Plaintiff also makes something of the No. 2 oil being referred to as "gas oil," *see* G.G. Hawley, *The Condensed Chemical Dictionary,* 481, 491 (10th ed. 1981), while admitting gas oil falls within the broad category of fuel oil. *See* McGraw Hill, *Dictionary of Scientific and Technical Terms* 66 (3rd ed. 1984). According to the ASTM, the Grade No. 2 gas oil is a petroleum distillate, as distinguished from residual petroleum products comprising the heavier fuel oils. *See ASTM Standards* 209 (Significance of ASTM Specification for Fuel Oils).

Finally, plaintiff points out that the uses of Grade No. 2 gas oil differ from those of Grades No. 5 and No. 6. Grade No. 2 "is intended for use in atomizing type burners which spray the oil into a combustion chamber where the tiny droplets burn while in suspension." *Id.* Grade No. 6 fuel oil, on the other hand, is used mostly for commercial and industrial heating. Its disadvantage is that it is more difficult to handle, requiring preheating in the storage tank to permit pumping, additional preheating at the burner to permit atomizing, and additional devices capable of atomizing oils of a higher viscosity than the oil usual residential burners are capable of atomizing. The advantage of the heavier residual oils is lesser cost. *Id.*

Defendant counters by arguing simply that the imported fuel oil consisted of two products—one of the Soviet Union and one of Italy—which were mingled together prior to importation into the United States. As commingled merchandise, contends defendant, Customs properly subjected the importation to General Headnote 7(a), TSUS, which requires that

[t]he commingled articles shall be subject to the highest rate of duty applicable to any part thereof unless the consignee or his agent segregates the articles ...

Because of available documentation establishing the exact quantities of oil loaded in the respective countries, Customs was able to impose the applicable rate of duty to each portion of the commingled merchandise.

In *United States Industrial Chemicals, Inc. v. United States,* 29 Cust.Ct. 131, C.D. 1458 (1952), *appeal dismissed,* 41 CCPA 200, C.A.D. 551 (1954), the court concluded that such method of duty assessment was proper. In *Industrial Chemicals,* molasses from the Dominican Republic had been mixed together with molasses from Cuba in the tanks of the importing vessel. Because of available documentation and an acceptable method of testing for determining the quantity and value of the constituent parts, the court held that the molasses from Cuba was dutiable at a lower rate pursuant to a

trade agreement between Cuba and the United States.

The distinction in the present case, argues plaintiff, is that the mixing of the two products created a new product distinct from the original Russian gas oil and that two products were not merely commingled.

As the parties have submitted a stipulation of fact, and the Court is able to view any additional material facts in the light most favorable to plaintiff, *see United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962), the Court is satisfied that summary disposition of the legal issues in favor of defendant is appropriate. *See Lusson v. Carter*, 704 F.2d 646, 649–50 (1st Cir.1983). The Court concludes that the stipulated facts and the additional factual information submitted by plaintiff in the form of affidavits fail to prove, as a matter of law, that there was such a change in the appearance, character, identity or use of the Russian oil to warrant the conclusion that the imported blend was solely a product of Italy. Despite the differences in the products and the qualification of the Russian oil as a grade different from the blend, the essential character of the Russian component as a fuel oil used primarily for heating remained unchanged.

Plaintiff does not claim there was any processing done to the product in Italy other than simple mixing of the two oils, or that the value of the Russian oil was thereby enhanced. *Compare, National Juice Products*, 10 CIT at ——, 628 F.Supp. at 990–91, (total of domestic manufacturing contributing at most 6.68 to 7.57 percent to value of end product found not significant).

The Russian product and the Italian product were both classified as distillate and residual fuel oils (including blended fuel oils) under item 475.10, TSUS, and there is no indication the blend would have not been properly classified as such.[4] But although a change in tariff classification is certainly not controlling, *Rolland Freres, Inc. v. United States*, 23 CCPA 81, 89, T.D. 47763 (1935), the Court finds that the *same* classification treatment of the products involved in this case is some indication that the imported blend was not a new and different product. The imported components are each simply variant grades of the same product identified as fuel oil, with the resulting blend also identified as fuel oil.

It is also not determinative that the Russian No. 2 oil can also be referred to as "gas oil." First, "a change in the name of the product is the weakest evidence of a substantial transformation." *National Juice Products Assn.*, 10 CIT at ——, 628 F.Supp. at 989. Second, as already noted, gas oil is a specific type of fuel oil, but is not used for a substantially different purpose. *Supra*, p. 258. According to ASTM specifications and terminology, all of the oils involved in this case are intended for use in atomizing type burners, although the heavier, high viscosity fuel oil requires extra equipment for the atomization of the oil. *See ASTM Standards* 209. Again, the component products as well as the blend are variant grades of the same product and are intended for essentially the same uses.

## Conclusion

Because plaintiff has failed to allege or point to facts showing the character, identity or use of its imported blended fuel oil was substantially different from that component of the blend of Soviet origin, the defendant's cross-motion for summary

---

**4.** Schedule 4, Part 10 (TSUSA 1972) provides:

Crude petroleum (including reconstituted crude petroleum); topped crude petroleum; crude shale oil; and distillate and residual fuel oils (including blended fuel oils) derived from petroleum, shale, or both, with or without additives:

|  | | Rates of Duty |
|---|---|---|
|  | | 1 | 2 |
| 475.10 | Testing 25 degrees A.P.I. or more | 0.25¢ per gal. | 0.5¢ per gal. |

judgment must be granted. Customs properly applied headnote 7(a) for commingled merchandise to the oil mixture in question, segregating the components of the blend pursuant to available documentation, and assessed duty on the oil loaded in the Soviet Union as "a product of" the Soviet Union.