RAN–PAIGE COMPANY, INC., Plaintiff,

v.

The UNITED STATES, Defendant.

Nos. 93–274C, 93–276C, 93–419C and 93–420C.

United States Court of Federal Claims.

March 8, 1996.

Marc Lamer, Philadelphia, Pennsylvania, for plaintiff. Kostos and Lamer, P.C., of counsel.

John C. Erickson III, Department of Justice, Washington, D.C., with whom was Assistant Attorney General Frank W. Hunger, for defendant. David M. Cohen, Director, Jeanne E. Davidson, Assistant Director; and George U. Lane, Deputy Regional Counsel, General Services Administration, of counsel.

## OPINION

FUTEY, Judge.

These contract cases are before the court on plaintiff's motion for partial summary judgment and defendant's cross-motion for summary judgment. Plaintiff argues that the goods it provided complied with all provisions under the contracts with the General Services Administration (GSA). Therefore, plaintiff concludes that it is entitled to conversion of its terminations for default into terminations for convenience. Defendant, on the other hand, claims that plaintiff's goods do not comply with GSA clause 552.225–9 and seeks to recover the purchase price paid for the nonconforming goods.

1. The facts in this case are recited in an earlier unpublished opinion, filed on September 14, 1994. The facts below are addressed only as they pertain to this decision.

## Factual Background [1]

Defendant, the United States, through the GSA, awarded two contracts (GS–07F–61970 and GS–07F–62040) to plaintiff, Ran–Paige Company, Inc., for the manufacture and delivery of cooking pans and covers (cookware). Defendant awarded the first contract on May 22, 1992, and the second contract on May 29, 1992. Both contracts contain GSA clause 552.225–9, which implements the Trade Agreements Act of 1979, 19 U.S.C. §§ 2501–2582. This clause requires plaintiff to deliver products made only in certain countries:

552.225–9 (OCT 1990) (DEVIATION FAR 52.225–9)

(a) This clause implements the Trade Agreements Act of 1979 . . . by providing a preference for U.S. made end products, designated country end products, and Caribbean Basin country end products over other products.

.     .     .     .     .

(b) The Contractor agrees to deliver under this contract only U.S. made end products, designated country end products, Caribbean Basin country end product, or, if a national interest waiver is granted under section 302 of the Trade Agreements Act of 1979, nondesignated country end products. Only if such waiver is granted may a nondesignated country end product be delivered under this contract(s).[2]

The clause further indicates that, under certain circumstances, an end product made of components from nondesignated countries, but assembled in the United States, may be considered a "U.S. made end product":

"U.S. made end product," as used in this clause, means an article which . . . in the case of an article [consisting] in whole or in part of materials from another country or instrumentality, has been *substantially transformed in the United States into a new and different article of commerce with a name, character, or use distinct from that of the article or articles from which it was so transformed.* (emphasis added).

2. Pl.App. at 40–41, 109.

Plaintiff received "components" of the pans and covers from a supplier in China—Cosimex Ltd. of Hong Kong (Cosimex). China is not a designated country under the Trade Agreements Act. The components consisted of the pans and covers (without handles), the unattached handles, and fasteners for attaching the handles. The words "Made in China" were engraved into the pans and covers. Plaintiff assembled the components in the United States. The assembly process began by using a machine to attach the handles to each pan. The handles were further secured by rivets and handle fasteners, which were pressed into the pan and handle using a semi-automatic press. Plaintiff repeated the attachment process for the covers. After cleaning the cookware and matching the pans to the covers, plaintiff performed weight stress tests on samples of the cookware to ensure the security of the handles. For plaintiff's first two orders from Cosimex, the pans and covers were actually completed while they were still in China. Plaintiff, however, directed Cosimex to remove the handles before shipment. In the third order, plaintiff instructed Cosimex not to attach the handles.

Before defendant awarded the contracts to plaintiff, the GSA directed Mr. Ronald Edington, a government Quality Assurance Specialist, to inspect plaintiff's plant facilities in order to determine whether plaintiff could comply with the conditions of the contract. Mr. Edington notified plaintiff that the reason for the inspection was that defendant had concerns about plaintiff's ability to comply with the Walsh–Healey Act.[3] During the inspection, plaintiff showed Mr. Edington the completed cookware, which bore the "Made in China" imprint. After the contract award, Mr. Edington held a post-award conference, where he again inspected an end product

sample.[4] After the conference, defendant began placing orders for the cookware. On September 4, 1992, Mr. Edington inspected the first lots to be shipped under the contract. At that time, plaintiff gave Mr. Edington a "Material Certification" document from Cosimex. Mr. Edington rejected the certification because it was written in Chinese. Once plaintiff provided an English version, it shipped the cookware to the GSA. During the September 4, 1992, inspection, and the ones that followed, defendant never notified plaintiff of any concerns about compliance with the Trade Agreements Act.[5]

On November 18, 1992, however, Mr. Edington, along with Ms. Linda Smith, a GSA supervisor, returned to plaintiff's facilities. They notified plaintiff that, because the cookware came from China, plaintiff was not in compliance with the Trade Agreements Act, as implemented by GSA clause 552.225–9. On November 27, 1992, defendant issued a Cure Notice to plaintiff, warning that defendant would terminate the contracts for default unless plaintiff chose a new supplier from a "designated country." Plaintiff did not change suppliers. Instead, plaintiff indicated to defendant that the cookware satisfied the requirements of GSA clause 552.225–9. In response, on January 28, 1993, the contracting officer (CO) issued final decisions terminating the contracts due to plaintiff's alleged default.

Sometime before defendant issued the Cure Notice and terminated the contracts, defendant paid for shipments of cookware received under the contracts.[6] On February 24, 1993, the CO further notified plaintiff that the delivered cookware did not conform with the contract requirements because it came from a nondesignated country. Defendant

---

**3.** This act requires a contractor to be a manufacturer of the equipment used in the contract. 41 U.S.C. § 35(a). It applies different standards than those used to determine substantial transformation under the Trade Agreements Act.

**4.** The parties do not specify the date of this conference.

**5.** Mr. Edington conducted further inspections in October of 1992; November 5, 1992; and November 9, 1992.

**6.** The exact amount of payment is unclear. Defendant claims that it paid $35,775 under contract GS–07F–62040 and $30,024 under contract GS–07F–61970. This adds up to a total of $65,799, yet defendant requests $65,809 in its brief. Defendant does not explain this ten dollar difference.

directed plaintiff to replace the nonconforming goods, but plaintiff never did so. On June 23, 1993, the CO issued two more final decisions ordering plaintiff to return the amounts previously paid by defendant under the contracts. The record does not reflect what happened to the cookware that plaintiff already delivered to defendant.

On May 4, 1993, plaintiff filed two complaints in this court, one for each contract (Docket Nos. 93–274C and 93–276C). Count I of each complaint seeks a conversion from a termination for default to a termination for convenience (TFC) and TFC costs. Count II of each complaint claims breach of contract damages.[7] Defendant counterclaimed for the amounts already paid under the contracts. In response to the counterclaims, plaintiff filed two additional complaints (93–419C and 93–420C, one for each contract). In these latest complaints, plaintiff does not claim additional amounts under the contracts. Rather, plaintiff merely claims that "Ran–Paige is not indebted to the Government . . . for end-items delivered under the contract."[8]

Plaintiff now moves for summary judgment only on its TFC claims, arguing that, under a proper interpretation of GSA clause 552.225–9, it complied with the terms in each contract. Defendant, on the other hand, argues that a correct interpretation of the clause completely resolves the case in its favor. Accordingly, defendant cross-moves for summary judgment.

### Discussion

■ Summary judgment is appropriate when the pleadings raise no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law. RCFC 56; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). The moving party bears the burden of establishing an absence of evidence to support the non-movant's case. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). The party opposing summary judg-

ment has the burden of showing sufficient evidence, not necessarily admissible, of a genuine issue of material fact in dispute. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Any doubt over factual issues must be resolved in favor of the party opposing summary judgment, *Litton Indus. Prod., Inc. v. Solid State Sys. Corp.*, 755 F.2d 158, 163 (Fed.Cir.1985), to whom the benefit of all presumptions and inferences run. *H.F. Allen Orchards v. United States*, 749 F.2d 1571, 1574 (Fed.Cir.1984), *cert. denied*, 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985). In this case, the only issue before the court is whether plaintiff's undisputed efforts in the United States amount to a "substantial transformation" of the cookware components under GSA clause 552.225–9. Because this is a matter of contract interpretation, summary judgment is appropriate.

### I. *Substantial Transformation*

■ Plaintiff argues that its assembly process, performed in the United States, substantially transforms the Chinese cookware components so that the end product may properly be considered a "U.S. made end product." In support of its argument, plaintiff emphasizes the detailed procedures in the assembly process. Defendant claims that the process of fastening handles onto the pans and covers did not "substantially transform" the components as defined in the contracts.

Under GSA clause 552.225–9, the cookware will be considered a "U.S. made product" only if the component parts have been "substantially transformed in the United States into a new and different article of commerce with a name, character, or use distinct from that of the article or articles from which it was so transformed." Thus, the court must examine the name, character, and use of the components as compared to the end product.

Significantly, plaintiff uses the same terms in describing the components as it does in

---

7. Plaintiff requests $12,333.13 and $2,284, respectively, in TFC costs. As for breach of contract damages, plaintiff claims $120,398.26 and $67,723.60.

8. See Compl. at ¶ 17, No. 93–419C (Fed.Cl. Jul. 6, 1993); Compl. at ¶ 17, No. 93–420C (Fed.Cl. Jul. 6, 1993). The court consolidated all four complaints on October 18, 1993.

describing the end product. For example, when ordering the components from Cosimex, plaintiff referred to pans, covers, and handles.[9] These terms do not change when plaintiff refers to the end product.[10] Therefore, the evidence before the court indicates that plaintiff's process does not result in a distinct change in name.

The term "character" is defined as a feature or trait that forms the individual nature of a thing. RANDOM HOUSE UNABRIDGED DICTIONARY (2d ed. 1993). The main feature of the pan component of the cookware is its ability to contain food before, during, and after the roasting process. The main feature of the cover component is that it aids the roasting process by completely enclosing the food placed in the pans. The handles serve to aid in manipulating objects to which they are attached. These characteristics do not change once plaintiff assembles the components.

As for whether the use of the end product is distinct from the use of the components, it is notable that the composition and shape of the pan and cover "components" are created in China. Thus, they can be used as cookware even before undergoing plaintiff's assembly process. The handles, by their nature, cannot be used until they are attached to the pans and covers. In the first two orders, however, the handles were already attached in China. Plaintiff made Cosimex remove the handles for purposes of importation and merely reattached the handles once the components reached the United States. Therefore, many of the handle components had the exact same use as they did after plaintiff's assembly. In further orders, plaintiff simply instructed Cosimex to refrain from attaching the handles. Thus, at the very least, the use of the imported components was already predetermined at the time of importation. Either way, plaintiff's assembly process is not sufficient to create the distinct use required by GSA clause 552.225–9.

Plaintiff is correct in pointing out that the end product is not identical to the unassembled components. Further, attaching handles to pans and covers is more than a cosmetic change in that it increases the utility of the cookware. Nevertheless, based on the undisputed facts, plaintiff's process of attaching handles does not create an end product with a distinct name, use, or character sufficient to result in a "substantial transformation." Accordingly, the completed cookware cannot be characterized as a "U.S. made end product" under GSA clause 552.225–9.

The court's conclusion is supported by the application of the identical language under other statutes. See National Hand Tool Corp. v. United States, 16 Ct. Int'l Trade 308, 1992 WL 101006 (1992), aff'd, 989 F.2d 1201, 1993 WL 22705 (Fed.Cir.1993); Uniroyal, Inc. v. United States, 542 F.Supp. 1026 (Ct. Int'l Trade 1982), aff'd, 702 F.2d 1022 (Fed. Cir.1983); Belcrest Linens v. United States, 741 F.2d 1368 (Fed.Cir.1984). In National Hand Tool, plaintiff imported components of hand tools into the United States. In addition to assembling the parts, the plaintiff subjected the components to heat treatment, oil quenching, tempering, cleaning, and electroplating. The issue before the court was whether plaintiff was exempt from the county of origin marking requirements of 19 U.S.C. § 1304 (1988). To resolve this issue, the court analyzed whether plaintiff "substantially transformed" the imported components.

As in the present case, the court focused on whether the end product had a name, character, or use different from that of the imported components. The court emphasized that the name of the components did not change after plaintiff's processes and assembly, as demonstrated by plaintiff's own use of the terms. The court found that plaintiff's heat and chemical processes did not substantially alter the characteristics of the components. Finally, the court noted that plaintiff did not change the use of the components, especially given the fact that the use was predetermined at the time of importation. Based on the totality of these factors,

9. Def. Opp'n at App. at 1,2 (Fed.Cl. Jun. 19, 1995).

10. See, e.g., Pl. Proposed Findings of Uncontroverted Facts at ¶ 10 (referring to the "cover and pan" of the final product) (Fed.Cl. Feb. 7, 1995).

**122**

the court found that plaintiff had not substantially transformed the components. *National Hand Tool,* 16 Ct. Int'l Trade at 312. The facts in *National Hand Tool* are analogous to the ones currently before the court. In fact, the *National Hand Tool* plaintiff did more to the components than did the plaintiff in this case, yet that process was not enough to produce a substantial transformation.

The *Uniroyal* case provides additional support. In *Uniroyal,* plaintiff imported Indonesian shoes that were complete except that the outer soles were not attached. Once in the United States, plaintiff attached the outer soles to these almost-complete shoes, known as uppers. Again, the question was whether plaintiff was exempt from marking the uppers with the country of their origin. In determining whether the end product had been substantially transformed in the United States, the court noted that the upper component retained its ultimate shape, form, size, and even its identity despite the attachment process. Further, the court stressed that the uppers' intended use did not change upon attachment. The court concluded that the shoe was essentially completed in Indonesia and that the process of attaching soles did not substantially transform the components into a distinct end product. *Uniroyal,* 542 F.Supp. at 1031. Attaching soles to shoes is analogous to attaching handles to pans and covers. As with the uppers component in *Uniroyal,* the pan and cover components retain their essential shape, form, and size. Further, as previously, discussed, they remain recognizable after the handle attachment process and thus retain their identity, and their intended use does not change upon attachment of the handles.[11]

## II. *Estoppel*

■ In arguing against an interpretation of GSA clause 552.225–9 that would result in finding no substantial transformation, plaintiff points out that Mr. Edington inspected plaintiff's facilities on behalf of defendant and was shown indications that the pans and covers came from China. For example, plaintiff notes that, on many occasions, Mr. Edington inspected pans and covers, all of which bore the "Made In China" engraving. In addition, plaintiff at one point presented Mr. Edington with a certification written in Chinese. Despite these hints, defendant never objected to the origin of the components until November 18, 1992. Plaintiff concludes that defendant must have agreed with plaintiff that it complied with all contract provisions, including the substantial transformation requirements in GSA clause 552.225–9. Moreover, plaintiff argues that defendant's prior inaction estops defendant from presenting to the court a different interpretation of the substantial transformation requirements.

■ The elements of estoppel are: (1) misleading conduct, which may include silence and inaction; (2) reliance on this conduct; and, (3) material prejudice if the delayed assertion is permitted. *Lincoln Logs Ltd. v. Lincoln Pre–Cut Homes, Inc.,* 971 F.2d 732, 734 (Fed.Cir.1992). The following provision, appearing in both contracts, is relevant to the second element:

> No interpretation of any provision of this contract, including applicable specifications, shall be binding on the Government unless furnished or agreed to in writing by the Contracting Officer or his designated representative.[12]

Plaintiff has not alleged that any written interpretation of GSA clause 552.225–9 was furnished or agreed to in writing by defendant. Thus, even assuming defendant's silence was misleading, the above quoted provision indicates that plaintiff could not have relied on silence alone to assume a particular interpretation.

Further, the record before the court indicates that there was no mutual agreement as to whether plaintiff satisfied the substantial transformation requirements found in the Trade Agreements Act. Although the GSA

---

11. In *Belcrest Linens,* 741 F.2d 1368, the Court of Appeals for the Federal Circuit examined the "substantial transformation" issue under yet another statute—the Trade Expansion Act of 1962—and cited the process in *Uniroyal* as an example of failure to substantially transform the final product. *Id.* at 1372.

12. Pl.App. at 42, 111.

requested that Mr. Edington inspect plaintiff's facilities to determine whether plaintiff could perform according to all specifications,[13] it is undisputed that Mr. Edington planned to focus his inspection to resolve doubts about plaintiff's compliance under the Walsh–Healey Act. In addition, Mr. Edington notified plaintiff that the reason for the inspections would be to resolve the Walsh–Healey issues.[14] Thus, the record indicates that the parties concentrated on issues under the Walsh–Healey Act rather than the substantial transformation requirements under the Trade Agreements Act.

As a result, neither the undisputed circumstances nor the contract provision quoted above support altering the court's interpretation of GSA clause 552.225–9. Under this interpretation, plaintiff's assembly process did not "substantially transform" the cookware components into a "new and different article of commerce with a name, character, or use distinct from that of the article or articles from which it was so transformed," as required by the contracts. Because the cookware was defective under GSA clause 552.225–9, plaintiff is not entitled to a conversion from terminations for default to terminations for convenience, nor may plaintiff recover breach of contract damages.

■ Defendant's recovery, however, depends on what happened to the cookware. It is clear from the record that defendant believed that the cookware did not conform to GSA clause 552.225–9 and that plaintiff did not replace the cookware. It is not clear, however, what exactly defendant did with the cookware. In general, if a buyer completely rejects nonconforming goods and the seller fails to replace them, he or she would be entitled to recover the purchase price of the nonconforming goods. *Union Chemical Co.,* GSBCA No. 7392, 85–3 BCA ¶ 18,489 at 92,-859, 1985 WL 17019 (1985); *National Bag Corp.,* GSBCA No. 4331, 77–2 BCA ¶ 12,644 at 61,396, 1977 WL 1975 (1977); *see also* U.C.C. §§ 2–508, 2–602, 2–608, 2–711. If, on

the other hand, the buyer used the nonconforming goods, the buyer would only be entitled to the difference in the value of the goods warranted and the value of the goods provided. *See* U.C.C. § 2–714. Furthermore, under clause 552.246–70 ¶ f of the contracts in this case, defendant may sell the nonconforming goods.[15] Either of these circumstances would reduce defendant's damages. Given this uncertainty in the record, the court cannot award defendant the amount sought at this time.

### Conclusion

For the above stated reasons, plaintiff's motion for partial summary judgment is denied. While defendant's motion for summary judgment is granted, the court remands the issue of damages to the parties to determine the amount due. *See Spandome Corp. v. United States,* 32 Fed.Cl. 626, 636 (1995). The parties shall file a stipulation as to the amount of damages payable to the government within 60 days from the date this opinion is issued. Upon receipt of the stipulation, the Clerk is ordered to enter judgment for defendant for the amount stipulated without further order from the court. No Costs.

---

13. Pl.App. at 246, 251.

14. Pl. Proposed Findings of Uncontroverted Fact at ¶ 7; Pl.App. at 133 (containing affidavit of Jay M. Brodsky, President of Ran–Paige Co.).

15. Pl.App. at 12, 77. In fact, the CO's final decisions of June 23, 1993, indicate defendant's intent to dispose of the cookware under this clause. Def. Opp'n at App. at 10, 14.